UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

JENS H.S. NYGAARD

       Plaintiff,

v.

FÉDÉRATION INTERNATIONALE DE
L'AUTOMOBILE, FORMULA ONE
MANAGEMENT LTD., FORMULA ONE
WORLD CHAMPIONSHIP LTD.,
MERCEDES-BENZ GRAND PRIX LTD.,
DAIMLER AG, LEWIS HAMILTON, RED
BULL TECHNOLOGY LTD., RED BULL
RACING LTD., FERRARI S.P.A.,
CHARLES LECLERC, AND DALLARA
AUTOMOBILI S.P.A.,

       Defendants.

Case No. 6:20-cv-00234-ADA

**JURY TRIAL DEMANDED**

**FÉDÉRATION INTERNATIONALE DE L'AUTOMOBILE'S
PARTIAL ANSWER TO FOURTH AMENDED AND FIRST
SUPPLEMENTAL COMPLAINT FOR PATENT INFRINGEMENT**

Defendant Fédération Internationale de l'Automobile ("FIA") hereby responds via this

amended answer to Plaintiff Jens H.S. Nygaard's ("Plaintiff") Fourth Amended and First

Supplemental Complaint ("Fourth Amended and First Supplemental Complaint" or "FAFSC") for

Patent Infringement.  Unless specifically admitted below, FIA denies each and every allegation in

the Fourth Amended and First Supplemental Complaint other than assertions of the doctrine of

equivalents, which are subject to FIA's pending motion to strike. Because FIA filed a motion to

strike assertions of the doctrine of equivalents in the Third Amended Complaint (TAC) and no

new assertions of the doctrine of equivalents are put forth in the FAFSC, no further response to

any such allegation is required. The numbered paragraphs below correspond to the numbered

paragraphs of the FAFSC. Headings used in the FAFSC are restated below for ease of reference,

but no admissions are thereby made, as such headings are not allegations requiring an answer. Any

allegation that is denied may be on the basis that FIA is without knowledge or information sufficient to form a belief as to the truth of the allegation even if not expressly stated. FIA responds to Plaintiff's specific allegations as follows:

## I.   INTRODUCTION

Paragraph 1.   Plaintiff Jens H. S. Nygaard ("Nygaard") files this Fourth Amended and First Supplemental Complaint for infringement of his United States Patent No. 7,494,178 ("the '178 patent") in violation of Sections 271(a), (b), (c) and (f) of Title 35 of the United States Code, by Fédération Internationale de l'Automobile ("FIA"), Formula One Management Ltd. ("FOM"), Formula One World Championship Ltd. ("FOWC"), Mercedes-Benz Grand Prix Ltd. ("Mercedes"), Daimler AG ("Daimler"), Lewis Hamilton ("Hamilton"), Red Bull Technology Ltd. ("RBT"), Red Bull Racing Ltd. ("RBR"), Ferrari S.p.A. ( "Ferrari"), Charles Leclerc ("Leclerc"), and Dallara Automobili S.p.A. ("Dallara") (collectively "Defendants"), by making, using, selling, offering for sale or importing the "Halo" and "Aeroscreen" devices in the United States for implementation in cars in the United States; making and using road vehicles in the United States with Halo or Aeroscreen devices installed in them; causing to be supplied substantial components of the vehicles implementing the Halo and Aeroscreen from the U.S. for assembly abroad in a manner that would infringe the patent, and/or indirectly causing others to do so. The patented inventions are in structures to protect the heads and necks of drivers in the U.S. Grand Prix, the U.S. ePrix,[1] Formula 3 events in the United States, and their U.S. based teams, the NTT IndyCar 500 Series, other IndyCar Circuits, and also their U.S. based teams.  Infringement is alleged both literally and by doctrine of equivalents, of claims 1, 2, and 4 of the '178 patent.[2]  Incorporated by reference are the Third Amended Complaint including its Exhibit A (the '178 patent), Exhibit B (the June 4, 2021 final infringement contentions) and Exhibit C (the infringement contentions for a new claim for declaratory judgment based on the model of the newly announced F1 2022 car). The changes between the Third Amended Complaint and this pleading are underlined, so that Defendants need only answer to the changed paragraphs (unless they are required to change any prior answer based on discovery).

1.      FIA admits that Plaintiff filed the FAFSCFAFSC that alleges an action for patent

infringement of U.S. Patent No. 7,494,178 ("'178 Patent") against Federation Internationale de

l'Automobile ("FIA"), Formula One Management Limited ("FOM"), Formula One World

---

[1] Footnote in FAFSC: Formula E refers to Formula racing with electric cars.

[2] Footnote in FAFSC: Defendants Mercedes, Daimler, Ferrari, Leclerc and Hamilton, have been dismissed without prejudice based on the "customer-suit exception," and Plaintiff alleges they are bound by the results of the lawsuit with FIA. Dallara was dismissed without prejudice for lack of personal jurisdiction. They remain in the complaint in the event the customer-suit exception or personal jurisdiction grounds change. Additional allegations of personal jurisdiction are added as to Dallara consistent with Plaintiff's Motion for Reconsideration of dismissal of Dallara. They are also included to the extent needed to preserve Plaintiff's future rights in the course of this litigation.

Championship Limited ("FOWC"), Mercedes-Benz Grand Prix Ltd. ("Mercedes"), Daimler AG ("Daimler"), Lewis Hamilton ("Hamilton"), Red Bull Technology Ltd. ("RBT"), Red Bull Racing Ltd. ("RBR"), Ferrari S.p.A., ("Ferrari"), Charles LeClerc ("LeClerc"), and Dallara Automobili S.p.A. ("Dallara").  FIA admits that, as best understood, the FAFSC asserts that one or more defendants infringe claims 1, 2, and 4 of the '178 Patent.  FIA, however, denies that it has infringed any claim of the '178 Patent literally.  FIA also denies that Plaintiff has properly asserted infringement under the doctrine of equivalents and has filed a motion to strike assertions of the doctrine of equivalents in the FAFSC, which Plaintiff incorporated by reference.  To the extent any allegation in  paragraph 1 asserts the doctrine of equivalents, no further response to that allegation is required.  In response to footnote 1, FIA admits that Formula E refers to Formula racing with electric cars. The remaining allegations in paragraph 1 of the FAFSC relate to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations, and therefore denies them. To the extent any remaining allegations in paragraph 1 of the FAFSC relate to the FIA, those allegations are denied.

### A.  The Halo

Paragraph 2.   The Halo is a device that is integrated into Formula 1 ("F1"), Formula E, Formula 3, and other "Formula" cars.

2.        FIA admits that the Halo is integrated into Formula 1, Formula E, and certain other "Formula" cars.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the remaining allegations in paragraph 2 of the FAFSC, and therefore denies them. To the extent any allegations in paragraph 2 are not expressly admitted, they are denied.

Paragraph 3.   The Halo was used in Formula 1 racing in 2018, 2019, 2020, and 2021.

3.        Admitted.

Paragraph 4.   The Halo is designed to protect the drivers' heads and necks in accidents and from debris.

4.      FIA admits that the Halo is intended to improve driver safety, and in particular to protect drivers' heads from debris. To the extent any allegations in paragraph 4 are not expressly admitted, they are denied.

Paragraph 5.   No driver has died or suffered a serious head or neck injury in a Formula car with a Halo.

5.      Denied.

Paragraph 6.   The Halo is credited with saving several drivers in Formula events from death or serious injury, including Romain Grosjean at the 2020 Bahrain Grand Prix, Charles Leclerc at the 2018 Belgian Grand Prix, and others in open cockpit Formula races in 2018, 2019, and 2020.

6.      FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the allegations in Paragraph 6 of the FAFSC and thus denies them.

Paragraph 7.   The Halo prevented debris from falling on Max Verstappen at the 2021 British Grand Prix after he crashed into a safety barrier.

7.      FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the allegations contained in paragraph 7 of the FAFSC and thus denies them.

Paragraph 8.   The Halo prevented debris from falling on Charles Leclerc at the 2020 Italian Grand Prix after he crashed into a safety wall.

8.      FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the allegations contained in paragraph 8 of the FAFSC and thus denies them.

Paragraph 9.   The Halo was used by every race car that competed in the 2018 U.S. Grand Prix.

9.      Admitted.

Paragraph 10.  The Halo was used by every race car that competed in the 2019 U.S. Grand Prix.

10.     Admitted.

Paragraph 11.  The Halo was used by every race car in Formula 3 events in the U.S. in 2019 and thereafter.

11.    Admitted.

Paragraph 12.  The Halo was used in the 2021 U.S. Grand Prix.

12.    Admitted.

Paragraph 13.  A model of the 2022 Formula 1 car was made public by FOM and FIA in or around July 15, 2021.  This model included a Halo.

13.    FIA admits that a non-working model of the 2022 Formula One race car with a Halo has been made public.  To the extent any allegations in paragraph 13 are not expressly admitted, they are denied.

Paragraph 14.  The regulations adopted for 2022 require the use of the Halo in all Formula 1 Grand Prix events in the same way, for the same purposes, in approximately the same configuration as deployed this year and in 2018 and 2019.

14.    The FAFSC's allegations of "the regulations adopted for 2022" is vague, including for example, the allegations do not identify what regulations are at issue or what entity adopted them, and are therefore denied.  Further, the allegations that "the regulations" require use "in the same way, for the same purposes, in approximately the same configuration as deployed this year and in 2019 and 2019" is vague and are therefore denied.  To the extent any allegations in paragraph 14 are not expressly admitted, they are denied.

Paragraph 15.  The Halo has enabled the growth of the popularity for Formula 1 racing by protecting preventing deaths and serious injuries to drivers.

15.    Denied.

Paragraph 16.  The Halo has enabled campaigns to enhance the popularity of Grand Prix drivers because it has eliminated mortal and serious injuries to drivers' heads and necks in accidents in Grand Prix events.

16.    Denied.

Paragraph 17.  The Halo permits for publicizing of attention-grabbing accidents without driver deaths—as, for example, the accident involving Romain Grosjean on November 30, 2020, at the Bahrain Grand Prix as highlighted in Season 3, Episode 9 of the Netflix show, "Drive to Survive," "Man on Fire".  Other examples, include the accidents involving Max Verstappen and Lewis Hamilton at the 2021 British Grand Prix and the 2021 Italian Grand Prix, among others.

17.    Denied.

Paragraph 18. The Halo has facilitated rule changes by the teams, FOM, FWOC and the FIA to encourage more competitive driving by eliminating head and neck injuries in accidents in Formula 1 racing and IndyCar Circuits racing. For example, 2022 rule changes for Grand Prix racing are intended to enable closer car positions during races, more overtaking during races, and other maneuvers to make racing more competitive and exciting for fans.

18.    FIA admits that the 2022 rule changes for Formula One Grand Prix racing allow

formula racing cars to more closely follow one another and to increase overtakes during races. To

the extent the allegations in paragraph 18 are not expressly admitted, they are denied.

Paragraph 19. The U.S. Grand Prix is a premier sporting and entertainment event in Texas. Vehicles with Halos are used in the U.S. Grand Prix events and race to entertain ticket-holders, to make video and copyrighted material for broadcast within and from the U.S. abroad, to make other video, audio and recordings of racing events and race related entertainment, which are shown on networks such as ESPN, Netflix, YouTube, and other outlets, and to promote merchandise and video games tied to F1 Grand Prix racing. The Halo has been used to enhance the quality and value of this entertainment, and related activities and products, by protecting drivers from serious injury in racing during these events.[3] Vehicles with Halo are used as the focus of these events and materials. The racing cars with Halos, and the value of these events, are used by FIA to charge site fees to the venue, COTA. This event was highly successful with the biggest weekend attendance of any F1 Grand Prix weekend in the 2021 season (over 400,000 fans), and television audience of about 150% of the average Grand Prix race in 2021.

19.    FIA admits that the U.S. Grand Prix is a sporting and entertainment event in Texas

and that formula race cars with Halos were used at the 2018 and 2019 U.S. Grand Prix events.

FIA admits that formula racing cars are shown on video through ESPN, Netflix, and YouTube. In

response to footnote 3, FIA admits it has a YouTube channel. The remaining allegations in

footnote 3 of the FAFSC relate to entities other than FIA and are therefore denied. FIA lacks

---

[3] Footnote in FAFSC: By way of example, among other things, FOM and FOWC also use vehicles with the Halo to make video and copyrighted material for "Drive to Survive" in cooperation with Netflix and Box To Box Productions. They are also used by Defendants to make video games from simulations and video and audio of racing in the U.S. at COTA and other tracks. Further, FOM has its own channel on YouTube with 5.86 million subscribers, on which it posts videos hosted on servers in the U.S. for viewing on computers and other devices in the U.S., including video of U.S. racing. Likewise, Red Bull Honda's YouTube channel has nearly 1 million subscribers. FIA also has a YouTube channel.

knowledge or information sufficient to form a belief as to the truth of the substance of the remaining allegations in paragraph 19 and therefore denies them.  To the extent any allegations in paragraph 19 and/or footnote 3 are not expressly admitted, they are denied.

**B.  The Aeroscreen**

Paragraph 20.  The Aeroscreen is a safety device deployed in cars competing in the NTT IndyCar 500 Circuit and other IndyCar Circuits.

20.     The allegations in paragraph 20 of the FAFSC are related to entities other than the FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the allegations in paragraph 20 and therefore denies them.

Paragraph 21.  The Aeroscreen includes a Halo-type component that performs the same function in the same way in approximately the same configuration as the Halo.

21.     FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC. To the extent any allegation in paragraph 21 asserts the doctrine of equivalents, no further response to that allegation is required.  The remaining allegations in paragraph 21 of the FAFSC are related to entities other than the FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 22.  Although only first deployed in the 2020 NTT IndyCar 500 season, the Aeroscreen has save the lives of several drivers from death or injury, including in a major accident in a race in Iowa on July 18, 2020, in an accident on August 27, 2020, a race in Alabama on April 21, 2021, and at a race in Texas on May 2, 2021.

22.     The allegations in paragraph 22 of the FAFSC are related to entities other than the FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 23.   No driver has suffered a head or neck injury in a car with an Aeroscreen in Indy500 or IndyLights racing.

23.     The allegations in paragraph 23 of the FAFSC are related to entities other than the FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

### C. Overview of Development of the Halo

Paragraph 24. After the death of driver Henry Surtees in a Formula 2 event in 2009, FIA and/or the FIA Institute for Motorsport and Sustainability ("The FIA Institute")[4] committed resources to research improvements for protection for drivers' heads and necks in open cockpit (Formula) racing.

24.     FIA admits that publicly available information confirms that Henry Surtees died while driving in a Formula 2 event. FIA admits that it, in conjunction with the FIA Institute and the Global Institute for Motorsport Safety, has always been focused on safety in FIA administered Formula events. FIA admits that it, along with others, conducted years of study and testing of multiple safety devices, including various devices to protect the heads and necks of drivers. With respect to the allegations in footnote 4, FIA admits that it formed the FIA Foundation in 2001 as a charitable entity and that these organizations formed the FIA Institute for Motorsport Safety and Sustainability in 2004. FIA admits that the FIA Institute was closed at the end of 2016. To the extent any allegations in paragraph 24 and/or footnote 4 are not expressly admitted, they are denied.

Paragraph 25. This concern grew after the death of Dan Wheldon in open cockpit (IndyCar 500) racing.

25.     The FAFSC's allegations of "This concern grew" is vague and ambiguous and is therefore denied. To the extent allegations in paragraph 25 of the FAFSC are related to entities other than FIA, the FIA lacks knowledge or information sufficient to form a belief as to the truth

---

[4] Footnote in FAFSC: FIA formed the FIA Foundation in 2001 as its charitable arm, and these organizations formed the FIA Institute in 2004. FIA closed the FIA Institute at the end of 2-16 and took over the "Halo" development effective January 1, 2017.

of the substance of those allegations and therefore denies them.  To the extent any allegations in paragraph 25 are not expressly admitted, they are denied.

Paragraph 26. In 2011, the FIA and/or the FIA Institute, tested different options for protection of drivers, including a "jet fighter canopy" and other devices based on adding structures around the driver.

26.     FIA admits that it, in conjunction with the FIA Institute and the Global Institute for Motorsport Safety, has always been focused on safety. FIA admits that it, along with others, conducted years of study and testing of multiple safety devices, including various devices to protect drivers, which including, among others, a "jet fighter canopy."  The FAFSC's allegations of "different options" and "based on adding structures around the driver" are vague and ambiguous and are therefore denied.  To the extent any allegations in paragraph 26 are not expressly admitted, they are denied.

Paragraph 27.  IndyCar also wanted to develop safety measures to address these same risks in its open cockpit racing.

27.     The allegations in paragraph 27 of the FAFSC are related to entities other than the FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 28. Upon information and belief, FIA and the FIA Institute garnered cooperation from F1 Grand Prix teams and others, including IndyCar for their safety research ("the Project").  Dr. Trammell of IndyCar participated in meetings of the FIA Institute on a quarterly basis since 2011.

28.     The FAFSC's allegations of "upon information and belief" and "garnered cooperation from F1 Grand Prix teams and others, including IndyCar for their safety research ("the Project")" are vague and ambiguous and are therefore denied. FIA denies that it undertook a single "project" to develop solutions to address the risks to drivers' heads in open cockpit (e.g., Formula) cars, and avers that it undertook multiple projects to develop such solutions.  To the extent allegations in paragraph 28 of the FAFSC are related to entities other than FIA, the FIA lacks

9

knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them. To the extent any allegations in paragraph 28 are not expressly admitted, they are denied.

Paragraph 29. Both the Halo and the Aeroscreen have their genesis in the Project.

29.     FIA denies that the Halo had its genesis in "the Project" as Plaintiff has defined that term. The remaining allegations in paragraph 29 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the allegations in paragraph 29, and therefore denies them. To the extent any allegations in paragraph 29 are not expressly admitted, they are denied.

Paragraph 30. The Halo was developed after a series of meetings among Andy Mellor, Paddy Lowe, Dider Perrin, Luca Pignacca and others with Mr. Nygaard from November 2012 to March 2013 in Paris, at McLaren in Woking, England, and FIA Headquarters in Paris.

30.     The FAFSC's allegations of "a series of meetings" and "and others" are vague and ambiguous and are therefore denied. FIA denies that the Halo was the result of any meeting with Mr. Nygaard. FIA admits that one or more individuals representing the FIA Institute, including Andy Mellor, met with Mr. Nygaard during the period of time from November 2012 to March 2013 in Paris or in Woking, England. FIA admits that the Halo was developed after 2013. To the extent any allegations in paragraph 30 are not expressly admitted, they are denied.

Paragraph 31. At a meeting on March 27, 2013, at FIA Headquarters in Paris, France among him, the FIA Institute, FIA and Dallara, Mr. Nygaard explained the benefits of his patented inventions to make open cockpit racing safer for drivers.

31.     The FAFSC's allegations of "his patented inventions" is vague and ambiguous and is therefore denied. FIA denies any invention by Mr. Nygaard. FIA admits that Mr. Nygaard attended a meeting on March 27, 2013 at FIA headquarters. To the extent any allegations in paragraph 31 are not expressly admitted, they are denied.

Paragraph 32.  At this meeting, Mr. Nygaard discussed how his inventions used binocular vision technology ("BVT") to permit for use of a center pillar to protect drivers' heads and necks in collisions, rollovers, crashes, and from large flying debris.

32.     The FAFSC's allegations of "his inventions" is vague and ambiguous and is therefore denied.   FIA denies any invention by Mr. Nygaard.   To the extent any allegations in paragraph 32 are not expressly admitted, they are denied.

Paragraph 33.  At this meeting, Mr. Mellor, Mr. Pignacca and Mr. Perrin had notebooks that included copies of Mr. Nygaard's European Patent Office (EPO) patent applications.

33.     The FAFSC's allegations of "notebooks" is vague and ambiguous and is therefore denied.   To the extent any allegations in paragraph 33 are not expressly admitted, they are denied.

Paragraph 34.  At this meeting, Mr. Mellor gave Mr. Nygaard a graphic showing a design of a structure with a center pillar over and around the cockpit of an open cockpit car based on the '178 patent.

34.     The FAFSC's allegations of "a graphic showing a design of a structure with a center pillar over and around the cockpit of an open cockpit car based on the '178 patent" is vague and ambiguous and is therefore denied.   To the extent any allegations in paragraph 34 are not expressly admitted, they are denied.

Paragraph 35.  Mr. Mellor, Mr. Perrin and Mr. Pignacca each had notebooks with them at the March 27, 2013 meeting.  Their notebooks each contained a copy of a counterpart application to Mr. Nygaard's U.S. application for the '178 patent, which included the same inventions and overlapping language and drawings.

35.     The FAFSC's allegations of "notebooks," "counterpart application to Mr. Nygaard's U.S. application for the '178 patent," "same inventions," and "overlapping language and drawings" are vague and ambiguous and are therefore denied.   FIA denies any invention by Mr. Nygaard.  To the extent any allegations in paragraph 35 are not expressly admitted, they are denied.

Paragraph 36.  Mr. Nygaard's patents as well as pending applications, were discussed at this meeting.

36.     The FAFSC's allegations of "patents as well as pending applications" is vague and ambiguous and is therefore denied.   To the extent any allegations in paragraph 36 are not expressly admitted, they are denied.

Paragraph 37.  Mr. Mellor and others at the meeting discussed bringing Mercedes into the development process for the Halo.

37.     The FAFSC's allegations of "and others," "the meeting," and "bringing Mercedes into the development process for the Halo" are vague and ambiguous and are therefore denied. To the extent any allegations in paragraph 37 are not expressly admitted, they are denied.

Paragraph 38.  After the meeting, FIA created an April 3, 2013, "Action Plan for Single Seat Driver Evaluation."  This work plan was based on the discussion at the March 27, 2013 meeting.  It included as its first action item that "AM" (Andy Mellow) would initiate creation of "'BVT Principles' technical specification with JHSN to be completed by April 25, 2013."

38.     The FAFSC's allegations of "based on the discussion" is vague and ambiguous and is therefore denied.  FIA denies that it created any "Action Plan for Single Seat Driver Evaluation." FIA admits that an email sent from Mr. Mellor to Mr. Nygaard and others on April 3, 2013 ("April 3, 2013 email") was placed behind a tab sheet prepared for a subsequent meeting in London on April 17, 2013, having a title "Action Plan for Single Seat Driver Evaluation."  FIA admits that the April 3, 2013 email included the phrase "AM to initiate creation of 'BVT Principles' technical specification with JHSN – complete by 25 April 2013."  FIA admits that Mr. Nygaard attended a meeting on March 27, 2013 at FIA headquarters. To the extent any allegations in paragraph 38 are not expressly admitted, they are denied.

Paragraph 39.  Sometime after the meeting, Mr. Mellor emailed Mr. Nygaard and Mr. Pigancca the work plan and a copy of a counterpart application to the U.S. application that had resulted in issuance of the '178 patent in 2009 and other materials. A follow up meeting was scheduled for April 17, 2013 in London.

39.     The FAFSC's allegations of "sometime after the meeting," "the work plan," "a copy of a counterpart application to the U.S. application that resulted in issuance of the '178

12

patent," and "other materials" are vague and ambiguous and are therefore denied.  FIA admits that

after it received Nygaard's licensing demand, Mr. Mellor requested a meeting with Mr. Nygaard

in London for April 17, 2013, created an agenda for that meeting and appended documents thereto,

which are identified by Bates Numbers NYGAARD00042450-463. To the extent any allegations

in paragraph 39 are not expressly admitted, they are denied.

Paragraph 40.  Materials for the April 17, 2013, meeting were circulated with a cover page titled, "Potential Application of Binocular Vision Transparency in Motor Sport and Mobility."

40.     The FAFSC's allegations of "circulated" is vague and ambiguous and is therefore

denied.  FIA admits the documents identified by Bates Numbers NYGAARD00042450-463 were

provided by Mr. Mellor to Mr. Nygaard.  To the extent any allegations in paragraph 40 are not

expressly admitted, they are denied.

Paragraph 41.  Mr. Paddy Lowe became technical director of Mercedes on June 3, 2013, among his assignments at that time were to supervise the development of additional safety measures for F1 racing.  Mr. Lowe was technical director at Mercedes during its work on the Halo in 2015-2016 when the design of the Halo was finalized and testing completed.  The Halo was ready such that it could have been adopted for Grand Prix racing by July 2016 and deployed for the 2017 season.

41.     The allegations in paragraph 41 of the FAFSC are related to or dependent upon the

speculative and collective actions of entities other than the FIA. FIA lacks knowledge or

information sufficient to form a belief as to the truth of the substance of that allegation and

therefore denies it. The FIA objects to the phrase "Halo was ready" as vague and ambiguous and

the allegation is therefore denied.  To the extent any allegations in paragraph 41 are not expressly

admitted, they are denied.

Paragraph 42.  Following the March 27, 2013 meeting, Mr. Nygaard sent a letter to FIA setting forth his proposed terms for a license to his patents for safety devices.

42.     FIA admits that Mr. Nygaard sent a letter to FIA seeking a license for his patents.

To the extent any allegations in paragraph 42 are not expressly admitted, they are denied.

Paragraph 43.  In response to his letter, Mr. Nygaard was asked to join a meeting with the FIA Institute's administration in London on or about April 5, 2013.

43.    Denied.

Paragraph 44.  At that meeting, the FIA Institute demanded that Mr. Nygaard give over his patent rights to FIA royalty-free and with no guarantee of payment of any kind for any purpose. Mr. Nygaard refused. He was then excluded from further personal involvement in developing a safety device to protect drivers' heads and necks in Formula racing.

44.    Denied.

Paragraph 45.  On May 31, 2013, the FIA Institute once again reached out to Mr. Nygaard by letter regarding terms for a license to his '178 patent. Again, FIA demanded use of Mr. Nygaard's intellectual property royalty-free.

45.    FIA admits that the FIA Institute sent Mr. Nygaard a letter dated May 31, 2013.

FIA denies the remaining allegations in paragraph 45.

Paragraph 46.  At some point after Mr. Nygaard's meetings with Mr. Mellor, Mr. Lowe, Mr. Pignacca, and others in 2012 and 2013, Mercedes ultimately took the lead in developing a safety device with a pillar in front of the driver based on Binocular Vision Transparency "BVT principles," which became known as the "Halo."

46.    The FAFSC's allegation of "some point after Mr. Nygaard's meetings with Mr.

Mellor, Mr. Lowe, Mr. Pignacca, and others in 2012 and 2013," is vague and ambiguous and is

therefore denied.  FIA admits that Mercedes conceived of and introduced a safety device (that

itself was derived from prior work), which was developed into the device known as the Halo, with

a pillar in front of the driver.  FIA denies the remaining allegations in paragraph 46.

Paragraph 47.  The press for improved protection for drivers' heads and necks intensified after the deaths of Jules Bianchi following an accident at the 2014 Japanese Formula One Grand Prix and Justin Wilson at a 2015 IndyCar 500 race at the Poconos Speedway.

47.    The FAFSC's allegations of "press" and "intensified" are vague and ambiguous

and are therefore denied.  To the extent any allegations in paragraph 47 are not expressly admitted,

they are denied.

Paragraph 48.  In late 2015 and early 2016, the Grand Prix Drivers' Association Ltd. ("GPDA") petitioned for improved driver safety protection.

48.     FIA denies the allegations in the first sentence of this paragraph as stated but admits that the GPDA sent letters expressing support for improved driver safety protection.  To the extent any allegations in paragraph 48 are not expressly admitted, they are denied.

Paragraph 49.  In 2015, elements of the F1 Grand Prix Series fan base and press were urging Formula One and FIA to take measures to prevent any more driver deaths.

49.     Denied.

Paragraph 50.  Mercedes showed its prototype Halo in 2015.

50.     The allegations in paragraph 50 relate to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the allegations of paragraph 50 of the FAFSC, and therefore denies them. To the extent any allegations relate to FIA, they are denied.  FIA admits that a concept video of a halo shaped hoop frontal protection device was released by Mercedes in August 2015 on the www.formula1.com website.

Paragraph 51.  Ferrari implemented the Halo on a Grand Prix car in early 2016, and tested the Halo during the 2016 Spanish Grand Prix events.

51.     Denied.

Paragraph 52.  Other options for protection of drivers' heads and necks studied in 2016 were the "Shield" and RBT's early version of the Aeroscreen, neither of which had a pillar in the center of the cockpit in the field of vision of the driver, as was taught in the '178 patent.

52.     FIA admits that, in 2016, the F1 Strategy Group agreed to consider various frontal protection devices for head protection for formula racing cars, including a concept known as the "Shield."  The FAFSC's allegation of an "RBT's early version of the Aeroscreen" is vague and ambiguous and is therefore denied.   FIA admits that the Shield tested did not have a pillar in the center of the cockpit.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the remaining allegations and therefore denies them.  To the extent any allegations in paragraph 52 call for a legal conclusion, FIA denies them.  Further, to the extent any allegations in paragraph 52 are not expressly admitted, they are denied.

Paragraph 53.  In 2016, both the GPDA and FIA urged the F1 Strategy Group to adopt the Halo for F1 Grand Prix racing.

53.     FIA admits that in 2016 the GPDA and FIA recommended that the F1 Strategy group propose adoption of the Halo for Grand Prix racing. To the extent not expressly admitted, FIA denies the remaining allegations in paragraph 53 of the FAFSC.

Paragraph 54.  In 2016, Hamilton advocated for adoption of the Halo.

54.     The allegations in paragraph 54 of the FAFSC are related to persons or entities other than the FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 55.  On information and belief, safety devices for Formula racing that covered (e.g., canopy) or partially blocked the view of the driver (e.g., the Halo) were controversial with F1 teams.

55.     The allegations in paragraph 55 relate to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the allegations of paragraph 55 of the FAFSC, and therefore denies them. To the extent any allegations relate to FIA, they are denied.

Paragraph 56.  Any obstruction of the view of the drivers was controversial with fans who felt these types of modifications violated the spirit of open cockpit racing at the heart of Formula racing.

56.     The allegations in paragraph 56 relate to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the allegations of paragraph 56 of the FAFSC, and therefore denies them. To the extent any allegations relate to FIA, they are denied.

Paragraph 57.  In spring of 2016, it appeared that the Halo was the only effective measure to protect Formula drivers' heads and necks. Nonetheless, despite lobbying by the drivers, there was substantial division among the F1 Strategy Group over whether to adopt the Halo because of its aesthetics. Further, among other things, the F1 Strategy Group did not want to adopt a canopy or closed cockpit solution because it would have eviscerated Grand Prix racing's open cockpit format and tradition. At a 2016 meeting, the F1 Strategy Group delayed consideration of the Halo

in order to explore other alternatives, including RBT's Aeroscreen, and development of a device known as the "Shield."

57.    FIA denies the allegations of the first sentence of paragraph 57.  FIA admits that the F1 Strategy Group sets the general strategy relating to the FIA F1 World Championship and brings proposals to the F1 Commission, often based on the preparatory work of F1 Strategy Group working groups and advisory committees.  FIA admits that, in 2016, the F1 Strategy Group did not agree to propose the Halo to the F1 Commission for use during the 2017 FIA F1 World Championship. FIA admits that, in 2016, the F1 Strategy Group agreed to consider various alternative protective devices for formula race cars, including a concept introduced in 2017 known as the "Shield." FIA admits that the F1 Strategy Group did not agree to propose use of a closed cockpit or canopy design. To the extent not expressly admitted, FIA denies the remaining allegations in paragraph 57 of the FAFSC.

Paragraph 58.  RBT demonstrated its Aeroscreen at the 2016 Russian Grand Prix shortly after an April 2016 meeting of the F1 Strategy Group where the Halo was discussed, putting its product in competition with the Halo.

58.    The allegations in paragraph 58 relate to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the allegations of paragraph 58 of the FAFSC, and therefore denies them. To the extent any allegations relate to FIA, they are denied.

Paragraph 59.  The Shield was made out of "jet fighter glass" and bent around the driver leaving an opening at the top. Ferrari agreed to further develop and test the Shield.

59.    Some of the allegations in paragraph 59 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the allegations and therefore denies them.  The phrases "jet fighter glass" "bent around the driver leaving an opening at the top" are vague and ambiguous and are therefore denied.

Paragraph 60. Ferrari ultimately tested the Shield on an F1 car at events around the 2017 British Grand Prix at Silverstone.

60.    Admitted.

Paragraph 61. Ferrari driver, Sebastian Vettel, drove the Ferrari test on July 14, 2017, but aborted it after one lap, reporting that the curvature of the Shield made it difficult to see, especially in looking forward. He also reported the Shield made him dizzy.

61.    Admitted.

Paragraph 62. Although the Shield was scheduled for another test in September 2017 at the Italian Grand Prix, further testing cancelled after the unsuccessful run in England.

62.    Admitted.

Paragraph 63. Under the 2013-2020 Concorde Agreement that governs Formula 1 Grand Prix Racing, the F1 Strategy Group adopted rules for F1 Grand Prix Racing. The rules it adopted had to be ratified by the F1 Commission, and then implemented in the regulations by the FIA. The F1 Strategy Group included the entities that worked on development of solutions for protection for drivers' heads and necks: Mercedes, Ferrari, Red Bull, and FIA along with FOM.

63.    FIA admits that the F1 Strategy Group sets the agenda for proposed changes to regulations relating to the FIA F1 Championship and brings forward those proposals to the F1 Commission. FIA admits that the F1 Commission may approve or reject the F1 Strategy Group's proposals. FIA admits that the FIA implements regulations for motor sports. FIA admits that the F1 Strategy Group included Mercedes, Ferrari, Red Bull, and FIA. To the extent not expressly admitted, FIA denies the remaining allegations.

Paragraph 64. Liberty Media Corporation ("Liberty Media") purchased F1 as of January 2017.

64.    Admitted.

**D. Adoption of the Halo in Formula Racing**

Paragraph 65. FOM's Ross Brawn, FIA's Jean Todt, Toto Wolff, principal of Mercedes, Christian Horner, principal of RBR, and principals of Ferrari and other teams participated in a meeting of the F1 Strategy Group in July 2017. All teams competing in Formula One Grand Prix racing at the time were represent at the meeting even though not all of them were voting members of the F1 Strategy Group.

65.     FIA admits that, in July 2017, FOWC's Ross Brawn, FIA's Jean Todt, Mercedes's Toto Wolff, Red Bull's Christian Horner, and representatives from Ferrari and other teams attended an F1 Strategy Group meeting.  FIA admits that each team competing in the Formula One Grand Prix at the time had a representative present, but that not all teams were voting members of the F1 Strategy Group.  To the extent not expressly admitted, FIA denies the remaining allegations.

Paragraph 66.  The F1 Strategy Group (the member teams, FIA and F1) unanimously voted to adopt the Halo at the July 2017 meeting.[5]  Based on recommendations from technical representatives of FIA and the F1 Teams, FIA subsequently adopted rules for implementation of the Halo in Formula One, Formula 2, Formula E, Formula 3 and other Formula circuits.

66.     FIA admits that the Halo was adopted by unanimous vote.  The FAFSC's allegation of "based on recommendations from technical representatives of FIA and the F1 teams" is vague and ambiguous and is therefore denied.  Any allegations not admitted are denied.

Paragraph 67.  In the 2020 contracts, including the Concorde Agreement, among the teams, FOM, FOWC (and/or related entities) and FIA, the F1 Strategy Group has been eliminated.

67.     The FAFSC's allegations of "2020 contracts" is vague and ambiguous and is therefore denied.   FIA admits that the F1 Strategy Group has been eliminated.  To the extent not expressly admitted, FIA denies the remaining allegations.

Paragraph 68.  Vehicles and their components were supplied from the U.S. to other countries following the U.S. Grand Prix events for assembly into the invention abroad.

68.     Denied.

---

[5] Footnote in FAFSC: At the time of the 2017 meeting, the process for adoption of rules was described as follows: "The sport's regulations are currently set by a procedure involving the F1 strategy group, the F1 commission and the World Motor Sport Council. The strategy group, consists of five permanent members, Red Bull, Mercedes, Ferrari, McLaren and Williams plus the highest non-qualifying team (Force India) and Ecclestone, representing FOM, and Todt the FIA, where each party has equal weight." Giles Richard, "FIA *should take greater role in F1 governance, says Jean Todt*," GUARDIAN, U.S. EDITION, FORMULA 1 2016, http://www.theguardian.com/sport/2016/jun/23/fiashould-take-greater-role-in-f1-governance-says-jean-todt (last visited Sept. 7, 2020). Mr. Todt is quoted in the article as saying, "The governing body [FIA] has not enough power, or influence to have the final say on the rules." *Id.*

Paragraph 69.  F1 teams disassemble their vehicles down to sub-assemblies and component parts for shipment to the next race.

69.     The allegations in paragraph 69 of the FAFSC are related to entities other than FIA.

FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of

those allegations and therefore denies them.

Paragraph 70. Vehicle chassis and the Halos are separately packaged from other components, including power units, windscreens, steering wheels, and racing tires, among others, but can be, and in some instances are, shipped attached to the safety cell.

70.     FIA lacks knowledge or information sufficient to form a belief as to the truth of the

substance of the allegations in paragraph 70 of the FAFSC, and therefore denies them.


Paragraph 71.  F1 facilitates the movement of teams and their equipment between races before and after the U.S. Grand Prix in conjunction with DHL Holdings Express and Dell Will Customs Brokers.

71.     The allegations in paragraph 71 of the FAFSC are related to entities other than FIA.

FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of

those allegations and therefore denies them.

Paragraph 72.  The parts shipped include the Halo, chassis, tires, and other parts of the race cars.  The small "jagged windscreens" or small strip windscreens, are shipped by different teams in different ways: e.g., leaving them fixed to the front of the safety cell, shipping them with cargo, etc.  These windscreens were used in the 2018, 2019 and 2021 U.S. Grand Prix Races.

72.     The allegations in paragraph 72 of the FAFSC are related to entities other than FIA.

FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of

those allegations and therefore denies them.

Paragraph 73.  FOM and FOWC, induced and caused to be supplied the components that make up substantially all of the invention, as well as components that have no substantial non-infringing use (that is, the vehicle chassis with the Halo), which if assembled in the U.S. would infringe the '178 patent.

73.     FIA denies that there is any "invention."   FIA denies that there is any

"infringement."  The remaining allegations in paragraph 73 of the FAFSC are related to entities

other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of

the substance of those allegations and therefore denies them.

Paragraph 74.  There are two U.S.-based Formula E teams, BMW Andretti Motorsport and Geox Dragon, and both were required to use Spark Gen2 cars that incorporated the Halo for the 2019 and 2021 U.S. ePrix and other ePrix races.

74.     FIA admits that Formula E cars in 2019 and 2021 incorporated the Halo.  FIA

denies the remaining allegations of paragraph 74.

Paragraph 75.  Dallara worked on the chassis implementing the Halo for these cars.

75.     FIA admits that Dallara had a role in building the chasses for Formula E cars and

those chasses included the Halo. FIA denies the remaining allegations of paragraph 75 of the

FAFSC.

Paragraph 76.  Upon information and belief, these teams used their cars on U.S. roads in preparation for and during the July 2019 U.S. ePrix, and the 2019-2020, and 2020-2021 Formula E Seasons.

76.     The allegations in paragraph 76 of the FAFSC are related to entities other than FIA.

FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of

those allegations and therefore denies them.

Paragraph 77.  Formula E teams supplied or caused to be supplied components that make up all or substantially all of the invention, including their vehicle chassis with the Halo, and other custom components with no substantial non-infringing use, but for use in a Spark Gen2 car from the U.S. abroad for ePrix racing after the July 2019 and July 2021 U.S. ePrix, which would infringe the '178 patent if assembled in the U.S

77.     Denied.

Paragraph 78. DHL Express has a relationship with Formula E racing. DHL Express worked with about nine Formula E teams who supplied their vehicles and components to other countries following the 2019 and 2021 U.S. ePrix events, including Daimler's HWA Racelab team in 2019 and Mercedes' Formula E team in 2021. Upon information and belief, these teams would have shipped their vehicle chassis implementing the Halo separately from at least some other parts of their cars. DHL Express transported these cars and parts into the U.S. for these races and transported cars for Mercedes, HWA and other European teams outside of the U.S. after these races were over.

78.     The FAFSC's allegations of "relationship" is vague and ambiguous and is therefore denied.   FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations that are related to entities other than FIA and therefore denies them. FIA denies the remaining allegations of paragraph 78 of the FAFSC.

### E.  Halo Enables Successful Media Campaigns Spotlighting Drivers

To the extent that this heading requires a response, it is denied.

Paragraph 79.  Liberty Media, FOM and/or FOWC implemented a strategy of growing the Formula 1 Grand Prix fan base that relied heavily on social media and other media ("Media Campaign").

79.     The allegations in paragraph 79 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 80.  This strategy made extensive use of featuring the drivers as stars.

80.     The allegations in paragraph 80 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 81.  This strategy included what became the series "Drive to Survive" on Netflix, which was filmed starting with the 2018 racing season, and continuing for the 2019 and 2020 seasons.

81.     The allegations in paragraph 81 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 82.  Season 1 of "Drive to Survive" included material on the Halo's safety impact in the accident involving Charles Leclerc at the 2018 Belgian Grand Prix.

82.     The allegations in paragraph 82 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 83.  Season 3 of "Drive to Survive" included material about the Halo's safety impact in the accident involving Romain Grosjean at a November 30, 2020 race at Bahrain.

83.     The allegations in paragraph 83 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 84.  The Media Campaign includes extensive use of social media and internet communications.

84.     The allegations in paragraph 84 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 85.  The Media Campaign has succeeded in helping to grow the popularity of Formula One Grand Prix Racing in the United States.

85.     The allegations in paragraph 85 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 86.  By putting a spotlight on Formula One drivers, the Media Campaign increased the need for driver safety.

86.     The allegations in this paragraph are vague and therefore denied.

Paragraph 87.  The Media Campaign was enabled by the Halo because it prevented driver deaths and serious injury from trauma to their heads and necks when racing.

87.     Denied.

Paragraph 88.  Mercedes has stated in its filings with the U.K. Companies House that it generated over $5 billion in advertising revenue each year for Daimler AG's Mercedes-Benz brand.

88.     The allegations in paragraph 88 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 89.  Ferrari's Form F-20 filed with the U.S. Securities Exchange Commission (SEC) discusses the importance of the Scuderia Ferrari Racing Team and several of its drivers, including Charles Leclerc, to its brand.

89.     The allegations in paragraph 89 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 90.  FOM, FOWC and FIA have added a second U.S. race to the 2022 schedule in the Miami Florida area. Tickets for the Miami race are sold out.

90.     FIA admits that a second U.S. race has been added to the 2022 schedule in the Miami Florida area.  The remaining allegations in paragraph 90 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

## F.  Halo in the United States

Paragraph 91.  The U.S. Grand Prix has been held at Circuit of the Americas ("COTA") in Del Valle, Texas (Austin area) since 2012.

91.     Admitted.

Paragraph 92.  Upon information and belief, FIA was paid substantial fees by COTA to host the 2018 and 2019 Grand Prix events (approximately $30 million in 2019 alone).

92.     Denied.

Paragraph 93.  The State of Texas has reimbursed COTA for all or most of these fees.

93.     The allegations in paragraph 93 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 94.  In 2018, 2019 and 2021, a disproportionate amount of the revenue from Grand Prix's international racing circuit was raised from or in the United States, including the U.S. Grand Prix. About one-half of the revenue from Formula One Grand Prix Racing that was distributed to the ten teams went to Ferrari, RBR and Mercedes in those years.

94.     These allegations are vague and therefore denied.

Paragraph 95. All teams and drivers in the U.S. Grand Prix races in 2018, 2019 and 2021used the Halo on their cars.

95.     FIA admits that each team that raced at the Formula One U.S. Grand Prix in 2018, 2019 and 2021used a Halo on their formula racing cars.  To the extent the allegations are not expressly admitted, they are denied.

Paragraph 96.  All of the drivers in the U.S. Grand Prix races in 2018, 2019 and 2021wore helmets with visors that met FIA regulations.

96.     FIA admits that each driver that raced at the Formula One U.S. Grand Price races in 2018, 2019 and 2021wore a helmet with a visor.  To the extent any allegations in paragraph 96 are not expressly admitted, they are denied.

Paragraph 97.  All of the cars in the 2018, 2019 and 2021 U.S. Grand Prix races were capable of having windscreens fitted to them, and nearly all of them did for these races, including drivers for Mercedes, Red Bull and Ferrari.

97.     The allegations in paragraph 97 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 98. Drivers for Mercedes and Haas used what has been called a "jagged windscreen" on their cars in the 2018 and 2019 U.S. Grand Prix races. Mercedes also used the jagged windscreen in the 2021 U.S. Grand Prix race.

98.     The allegations in paragraph 98 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 99.  Racing Point used a jagged windscreen in the 2019 U.S. Grand Prix race. Aston Martin, formerly Racing Point, used a jagged windscreen in the 2021 U.S. Grand Prix race.

99.    The allegations in paragraph 99 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 100.    Ferrari, Red Bull and Toro Rosso drivers used small windscreens on their cars in the 2018 and 2019 U.S. Grand Prix races. Ferrari and Red Bull also windscreens on their cars in the 2021 U.S. Grand Prix race.

100.    The allegations in paragraph 100 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 101.    Other teams and drivers also used small windscreens on their cars, or their equivalent, in the 2018, 2019 and 2021 events.

101.    FIA filed a motion to strike assertions of the doctrine of equivalents in the Third Amended Complaint, which it incorporates herein by reference. The FIA's motion applies equally to the FAFSC. To the extent any allegation in paragraph 101 of the FAFSC asserts the doctrine of equivalents, no further response to that allegation is required. The remaining allegations in paragraph 101 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 102.    The U.S. Grand Prix has resulted in increased sponsorship for Formula One teams and organizations.

102.    This allegation is vague and therefore denied.

Paragraph 103.    The U.S. Grand Prix operating results were a factor in establishing a 2022 Grand Prix race in the Miami area.

103.    This allegation is vague and therefore denied.

Paragraph 104.    The U.S. Formula Grand Prix has been held at COTA since 2012, with the exception of 2020, when it was cancelled due to the COVID-19 pandemic.

104.     FIA admits that the Formula One U.S. Grand Prix has been held at COTA since 2012, with the exception of 2020, when it was cancelled due to the COVID-19 pandemic.  To the extent the allegations in paragraph 104 are not expressly admitted, they are denied.

Paragraph 105.          The 2021 U.S. Grand Prix race was held on October 24, 2021, at COTA in Austin, Texas.  All cars fielded by all teams and all drivers used a Halo fixed to their cars, including all drivers on the podium.  It appears that at least nine of the ten teams, seventeen of the drivers and cars, used a Halo with a windscreen.  This event had the highest attendance of any F1 race in 2021, with over 400,000 people attending the weekend's events.  The U.S. Grand Prix had about 150% of the average Grand Prix broadcast audience for other Grand Prix races that year. Max Verstappen of Red Bull won this race, and Red Bull's Sergio Perez placed third, giving Red Bull the highest points earned from this race.  Lewis Hamilton came in second place.  All of the drivers on the podium used windscreens.

105.     FIA admits that a U.S. Grand Prix race was held on October 24, 2021 at COTA in Austin and that all cars fielded by all teams and all drivers in that race used a Halo.  FIA admits that Max Verstappen of Red Bull won this race, and Red Bull's Sergio Perez placed third, giving Red Bull the highest points earned from this race.   FIA admits that Lewis Hamilton came in second place.  Because the term "fixed" is a claim term of the '178 patent, a response requires a legal conclusion and, thus, the FIA denies this allegation.  The remaining allegations in paragraph 105 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 106.          Since 2012, the U.S. Grand Prix has had an impact of billions of dollars on the local Austin area economy.

106.     The allegations in paragraph 106 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 107.          FOM has arranged for supply of components for the cars and their equipment after the 2018, 2019 and 2021 U.S. Grand Prix races to venues outside of the U.S. for races and events where the cars and equipment are assembled in a manner that would infringe if done in the United States.

107.     Denied.

Paragraph 108.          FOM makes deals with local race promoters, and chooses the venues.  FOM makes the calendar for Grand Prix races, which is then approved by the FIA.  FOM, FOWC, FIA and the teams caused cars in components and other equipment to be supplied after the 2018, 2019 and 2021 U.S. Grand Prix races to venues outside of the U.S. for races and events where the cars and equipment were assembled in a manner that would infringe if done in the United States.

108.    To the extent the allegations in paragraph 106 of the FAFSC are related to entities other than FIA, the FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.   All remaining allegations are denied.

Paragraph 109.          Spark Racing Technology was chosen to build all cars for Formula E for all teams. Spark contracted with Dallara to do the work on the chassis as well as other tasks for the cars. For the 2018-2019 Formula E Season, Spark sold the Spark Gen2 to Formula E teams. The Spark Gen2 has the Halo incorporated into it. For the 2020-2021 season, Spark is selling the Spark Gen2EVO, which likewise includes the Halo. Dallara contributed to the design of the vehicle chassis and the Halo for these vehicles.

109.    FIA admits that Spark collaborated with Dallara to work on the chassis and other parts for Formula E cars. FIA also admits that the Spark Gen2 includes a Halo. FIA denies the remaining allegations in paragraph 109 of the FAFSC.

Paragraph 110.          The Halo was used at the U.S. Formula E ePrix in New York City in July 2019 and July 2021 by all cars as required by FIA.

110.    Admitted.

Paragraph 111.          FIA has set the schedule with Formula E Ltd. and the teams that caused cars and equipment to be supplied after the 2019 and 2021 U.S. Formula E ePrix to venues outside of the U.S. where the cars and equipment are assembled in a manner that would infringe if done in the United States.

111.    Denied.

Paragraph 112.          All drivers in all cars wore helmets with visors.

112.    This allegation is vague and ambiguous as it relates to "all drivers in all cars" and therefore is denied.

Paragraph 113.          All cars had windscreens as required by FIA's Formula E regulations.

113.    Denied.

Paragraph 114.          The Halo has been used at Formula 3 events in the U.S. since at least 2019.

114.    The FAFSC's allegations of "at least 2019" is vague and ambiguous and is therefore denied.   FIA admits that FIA regulations required the use of the Halo in Formula 3 events beginning in 2018. To the extent the allegations in paragraph 114 are not expressly admitted, they are denied.

Paragraph 115.          Drivers in Formula 3 events wear helmets with visors and the front ends of their cars slope down.  FIA published rules for Formula 3 that required use of windscreens in the cockpit at all relevant times.

115.    The FAFSC's allegations of "front end of their cars slope down" is vague and ambiguous and is therefore denied.   FIA admits that FIA regulations currently require the use helmets with visors in Formula 3 events.  FIA denies that the rules for Formula 3 require the use of windscreens.  To the extent the allegations in paragraph 115 are not expressly admitted, they are denied.

**G.  The Aeroscreen in IndyCar**

Paragraph 116.          IndyCar was working with other collaborators on its own safety project, as well as monitoring the Project through at least Dr. Trammell's participation in quarterly meetings with the FIA Institute that included discussion of additional frontal protection. IndyCar developed a shield cockpit protection device with PPG. Although this device supposedly overcame the vision and other issues that a version of the Shield developed for the F1 Strategy Group suffered from, it ultimately was not strong enough to provide safety for the driver's head and neck according to the benchmarks used by IndyCar.Drivers in Formula 3 events wear helmets with visors and the front ends of their cars slope down.

116.    The allegations in paragraph 116 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 117.        At some point in or around 2018, IndyCar went to RBT and asked it to collaborate on the IndyCar driver safety device.  In May 2019, IndyCar and RBT held a joint press conference announcing the collaboration and upcoming testing of the device.

117.    The allegations in paragraph 117 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 118.        RBT and IndyCar included Dallara in the effort.

118.    The allegations in paragraph 118 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 119.        Dallara suggested the Halo be incorporated in the Aeroscreen for strength.

119.    The allegations in paragraph 119 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 120.        They redesigned IndyCar's Aeroscreen to incorporate the Halo.

120.    The allegations in paragraph 120 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 121.        Ultimately, RBT collaborated with Dallara as well as PPG and Pankl Racing Systems ("Pankl") and others to create the Aeroscreen.   RBT designed the Aeroscreen. RBT participated in testing of the Aeroscreen in 2019 in the United States, including in Indiana, Virginia, Alabama and Florida.

121.    The allegations in paragraph 121 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 122.        It is significant that the original Aeroscreen design was not able to pass the FIA's 2017 strength tests, nor was IndyCar's shield, but again only the Halo provided the strength needed to protect drivers' heads and necks in collisions and from flying objects.

122.    The FAFSC's allegations of "original Aeroscreen design" and "only the Halo provided the strength needed to protect drivers' heads and necks in collisions and from flying objects" are vague and ambiguous and are therefore denied.   The allegations in paragraph 122 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.  To the extent any of the allegations of paragraph 122 are related or directed to the FIA they are denied.

Paragraph 123.        IndyCar adopted the Aeroscreen for use starting in the 2020 Circuits, starting with the NTT IndyCar 500 official practices at COTA and Texas Motor Speedway the week of February 10, 2020.

123.    The allegations in paragraph 123 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.  To the extent any of the allegations of paragraph 112 are related or directed to the FIA they are denied.

Paragraph 124.        Above is a diagram of the Aeroscreen as completed for IndyCar racing circuits shown on a Dallara DW12 chassis.

124.    The allegations in paragraph 124 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 125.        Dallara made and also collected from other companies, Aeroscreen components at its facilities in Italy and rushed to import them into the U.S. so that they could be assembled and installed in preparation for testing in racing conditions at the NTT IndyCar 500 official practices the week of February 10, 2020, at COTA and Texas Motor Speedway.  RBT's project manager, Andy Damerum, was involved in this event.  RBT continued to work with the parts manufacturers to improve reliability and performance of parts for the Aeroscreen after this event.

125.     The allegations in paragraph 125 of the FAFSC are related to entities other than

FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance

of those allegations and therefore denies them.

Paragraph 126.          The first, and as of the filing of the Original Complaint, only public, ticketed IndyCar event where all teams participated with the Aeroscreen was the 2020 NTT IndyCar Series Official Practice on February 11, 2020 at COTA. The Aeroscreen was used at subsequent closed practices later that week at COTA and Texas Motor Speedway, and since that time in multiple IndyCar practices and events since the 2020 opening race on June 6, 2020, at Texas Motor Speedway in Fort Worth. Dallara made and also collected from other companies, Aeroscreen components at its facilities in Italy and rushed to import them into the U.S. so that they could be assembled and installed in preparation for testing in racing conditions at the NTT IndyCar 500 official practices the week of February 10, 2020, at COTA and Texas Motor Speedway.

126.     The allegations in paragraph 126 of the FAFSC are related to entities other than

FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance

of those allegations and therefore denies them.

Paragraph 127.          There was a problem with water leaking into the cars during the February 11 test. In addition, there was a problem with heat building up in the cockpit behind the Aeroscreen. After these tests, RBT and Dallara worked on the Aeroscreen to improve it before it was deployed in competition.

127.     The allegations in paragraph 127 of the FAFSC are related to entities other than

FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance

of those allegations and therefore denies them.

Paragraph 128.          Upon information and belief, Dallara made changes to the air ducts after studying the feedback from the Texas testing and/or the June 6, 2020, racing events at Texas Motor Speedway.  RBT cooperated with IndyCar in publicity regarding the use of the Aeroscreen at the opening race.

128.     The allegations in paragraph 128 of the FAFSC are related to entities other than

FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance

of those allegations and therefore denies them.

Paragraph 129.          IndyCar provided RBT and Dallara feedback on the performance of the Aeroscreen at the June 6, 2020, IndyCar racing events at Texas Motor Speedway.

129.    The allegations in paragraph 129 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 130.        Several IndyCar drivers have been spared death or serious injury due to the Aeroscreen in incidents in July 2020, August 2020, April 2021 and May 2021. Other drivers in F1, F2 and F3 have been saved death or serious injury due to the Halo.

130.    FIA admits that the Halo is intended to prevent driver injury or death.   The remaining allegations in paragraph 130 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

## II.    THE PARTIES

### A.  FIA

Paragraph 131.        FIA describes itself as "the governing body for world motor sport and the federation of the world's leading motorist organisations."[6]

131.    Admitted.

Paragraph 132.        It is a non-profit making association based in France.

132.    Admitted.

Paragraph 133.        It is a membership organization under French law.

133.    Admitted.

Paragraph 134.        FIA is the "governing body" for Formula 1, Formula E and F3 racing in the United States.

134.    FIA denies that it is "the 'governing body' for Formula 1, Formula E and F3 racing in the United States.  FIA admits that it is the regulator of Formula 1, Formula E, and F3 racing.

---

[6] Footnote in FAFSC: FIA, *The FIA,* http://www.fia.com/FIA (last visited July 23, 2021).

Paragraph 135.        FIA is the sanctioning authority for the U.S. Grand Prix held at COTA in Dell Valle, Travis County, Texas, the U.S. ePrix on New York City roads, the F3 Americas circuit, and for the scheduled Miami Grand Prix, among other racing in this country.

135.    The allegations of paragraph 135 are vague and ambiguous, particularly with respect to the term "among other racing in this country." As a result, FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the allegations, and therefore denies them. To the extent the allegations in paragraph 135 are not expressly admitted, they are denied.

**B.  FOM and FOWC**

With the exception of paragraphs 140-144 to which FIA has a specific response, such response incorporating all of FIA's previous responses, FIA respond as follows to paragraphs 136 through 148:

Subject to the paragraphs listed below, the allegations in these paragraphs of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the allegations in these paragraphs, and therefore denies them.  To the extent any allegations in paragraphs 136 through 148 are not expressly admitted, they are denied.

Paragraph 140.        Liberty Media and its affiliates organized FOM and FWOC after it purchased the Formula One entity effective January 2017 for about $4.6 billion and other terms. This sale was approved by the FIA.

140.    The allegation in the last sentence is vague, and FIA therefore denies the allegation as written.  The remaining allegations in paragraph 140 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 141.        F1, FIA and then F1 teams (including Mercedes, Ferrari and RBR) have contracts among them that provide for governance of F1 Grand Prix racing and also allocate

revenues among them.  F1 pays the FIA for adopting, codifying and administering rules for Formula One, Formula 2 and European Formula 3 racing.

141.    The allegations that F1, FIA, and F1 teams "have contracts among them that provide for governance of F1 Grand Prix racing and also allocate revenues among them" is vague and confusing, and FIA therefore denies the allegation as written.  The allegations that "F1 pays the FIA for adopting, codifying and administering rules" is vague and ambiguous, and FIA therefore denies the allegation as written.  FIA admits that there are one or more contracts that provide for the governance of F1 Grand Prix racing.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the remaining allegations in paragraph 141 and therefore denies them.  To the extent any allegation is not expressly admitted, FIA denies it.

Paragraph 142.        Among the contracts in effect during the 2018-2020 Seasons was the 2013 Concorde Agreement.

142.    Admitted.

Paragraph 143.        The 2013 Concorde Agreement was replaced by a 2020 Concorde Agreement, which substantially changed the governance of Formula One Racing.

143.    Denied.

Paragraph 144.        Mr. Nygaard communicated with Formula One and Mr. Ecclestone (and through them, Delta Topco) regarding his intellectual property by 2006.  Mr. Ecclestone participated in the Inaugural meeting of the F1 Strategy Committee, which was held at a Formula One Facility in Biggin Hill, England in October 2013.  The working papers for the meeting included a memorandum by Andy Mellor reporting on development of additional head protection for drivers, which discussed the Nygaard patent at length.  The F1 Strategy Committee took up matters on additional head protection for drivers at this meeting.  (Christian Horner, principal of RBR and CEO of RBT also attended this meeting and was provided a copy of Mr. Mellor's memorandum. The same is true for representatives of FIA, Ferrari and Mercedes, among others).

144.    FIA admits that Mr. Ecclestone participated in the October 2013 meeting of the F1 Strategy Committee.  FIA admits that Mr. Mellor drafted a memo that discussed the Nygaard patent in connection with the Lotus Roll Hoop, which was being proposed as an AFP device at the

October 2013 Strategy Group meeting, and that the memo was included in the materials provided

for the meeting.  The phrases "working papers," "took up," "The same is true," "discussed the

Nygaard patent at length" and "among others" are all vague and confusing.  FIA therefore denies

those allegations as written. Many of the allegations in paragraph 144 of the FAFSC are related to

entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the

truth of the substance of those allegations and therefore denies them.  Any allegation not admitted

is denied.

### C.  Mercedes

Paragraph 149.          Mercedes is the racing arm of Daimler. Mercedes was a member of
the F1 Strategy Group that adopted the Halo in 2017 as a safety measure for Grand Prix racing.
Mercedes actively worked on the Halo as part of the Project, and produced an early prototype for
it. Mercedes competed in the 2018 and 2019 U.S. Grand Prix with cars implementing the Halo.
Mercedes estimated in its most recent financial statement that it creates about $5 billion in
advertising and brand value for Daimler.

149.     FIA admits that Mercedes was a member of the F1 Strategy Group in 2017, that the

F1 Strategy Group adopted the Halo in 2017, and that the Halo is a safety measure for Grand Prix

racing.  FIA admits that Mercedes conceived of and introduced the design for the safety device

that became known as the Halo and produced an early prototype for it.  FIA admits that Mercedes

competed in the 2018 and 2019 U.S. Grand Prix with cars implementing the Halo.  The remaining

allegations in paragraph 149 of the FAFSC are related to entities other than FIA.  FIA lacks

knowledge or information sufficient to form a belief as to the truth of the substance of those

allegations and therefore denies them.  To the extent any allegations in paragraph 149 are not

expressly admitted, they are denied.

Paragraph 150.          Mr. Paddy Lowe was executive director (technical) for Mercedes
from about Spring of 2013 to 2017, during the time when the Halo was in development and
Mercedes produced prototype Halos. In or around December 17, 2012, shortly before Mr. Lowe
started at Mercedes, while he was finishing his time at McLaren, Mr. Lowe had an in-person
meeting with Mr. Nygaard, Mr. Andy Mellor of the FIA Institute, and others to discuss his patent
and BVT inventions with him.

150.    FIA admits that Mercedes produced a prototype for what became known as the Halo.  FIA admits that Mr. Mellor met with Mr. Nygaard and others in or around December 17, 2012.  FIA denies that said meeting was to discuss Mr. Nygaard's patent and/or BVT inventions.  FIA denies that Mr. Nygaard has any inventions.  The remaining allegations in paragraph 149 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.  To the extent any allegations in paragraph 150 are not expressly admitted, they are denied.

Paragraph 151.         Mercedes worked on the Halo in at least 2014-2017 with FIA and the FIA Institute.

151.    FIA admits that Mercedes conceived of, designed, introduced to the F1 Technical Working Group, and produced a prototype for what became known as the Halo.  To the extent any allegations in paragraph 150 are not expressly admitted, they are denied.

Paragraph 152.         Mercedes raced two cars in each of the 2018 and 2019 U.S. Grand Prix races with the Halo and "jagged windscreens."

152.    FIA admits that Mercedes raced two formula racing cars at the Formula One U.S. Grand Prix in 2018 and 2019, and each used a Halo.  FIA denies that any formula racing cars used a "windscreen" in the 2018 or 2019 Formula One U.S. Grand Prix races.  To the extent any allegations in paragraph 152 are not expressly admitted, they are denied.

Paragraph 153.         Mercedes' two drivers placed in the points in the 2018 U.S. Grand Prix coming in third and fifth in the race.  Mercedes' two cars finished First (Valterri Bottas) and Second (Lewis Hamilton) in the 2019 race, and driver Lewis Hamilton clinched his sixth Driver's Championship on points in the 2019 U.S. Grand Prix.

153.    Admitted.

**D.  Daimler**

The allegations in paragraphs 154 through 156 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the

substance of the allegations in these paragraphs, and therefore denies them.  To the extent any allegations in paragraphs 154 through 156 are not expressly admitted, they are denied.

### E.  Hamilton

With the exception of paragraph 159 to which FIA has a specific response, such response incorporating all of FIA's previous responses, FIA respond as follows to paragraphs 157 through 159:

Subject to the paragraphs listed below, the allegations in these paragraphs of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the allegations in these paragraphs, and therefore denies them.  To the extent any allegations in paragraphs 157 through 159 are not expressly admitted, they are denied.

Paragraph 159.        He directly infringed the Patent-in-Suit by driving one of the infringing Mercedes vehicles in each of the 2018 and 2019 U.S. Grand Prix races in Austin, Texas in vehicles that implemented the Halo. He used a "jagged windscreen" in both races. Hamilton's placement in the points in the U.S. Grand Prix in Austin, Texas in 2019 clinched his sixth driver's crown win for the 2019 season, much to his benefit, and also that of Mercedes and Daimler. Hamilton is paid tens of millions of dollars by Mercedes each season.

159.    FIA denies any infringement.  FIA denies that any formula racing cars used a "windscreen" at the 2018 and 2019 Formula One U.S. Grand Prix races.  The remaining allegations in paragraph 159 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

### F.  Ferrari

With the exception of paragraphs 165, 166, 168, and 172, to which FIA has a specific response, such response incorporating all of FIA's previous responses, FIA respond as follows to paragraphs 160 through 173:

Subject to the paragraphs listed below, the allegations in these paragraphs of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the allegations in these paragraphs, and therefore denies them. To the extent any allegations in paragraphs 160 through 173 are not expressly admitted, they are denied.

Paragraph 165.       Ferrari was a member of the F1 Strategy Group, and upon information and belief had veto power over its decisions.

165.    FIA admits that Ferrari was a member of the F1 Strategy Group. The remaining allegations in paragraph 165 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them. To the extent any allegations in paragraph 165 are not expressly admitted, they are denied.

Paragraph 166.       Ferrari was part of the F1 Strategy Group in 2017.

166.    Admitted.

Paragraph 168.       Its Scuderia Ferrari team competed in the 2018 and 2019 U.S. Grand Prix with cars implementing the Halo. It is known that Leclerc raced in 2019 with a small windscreen. Other Ferrari drivers at these 2018 and 2019 events either used a small windscreen or other equivalent structure (including a helmet and visor, and a virtual windscreen as explained more fully below).

168.    FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC. To the extent any allegation in paragraph 168 asserts the doctrine of equivalents, no further response to that allegation is required. The remaining allegations in paragraph 168 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 172.       McLaren, Williams, Dallara and other super sports car manufacturers have implemented virtual windscreens in their cars. A virtual windscreen is the equivalent of a windscreen.

172.    FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC. To the extent any allegation in paragraph 172 asserts the doctrine of equivalents, no further response to that allegation is required.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the remaining allegations in paragraph 172 and therefore denies them.

**G.  Leclerc**

With the exception of paragraph 174, to which FIA has a specific response, such response incorporating all of FIA's previous responses, FIA respond as follows to paragraphs 174 through 178:

Subject to the paragraphs listed below, the allegations in these paragraphs of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the allegations in these paragraphs, and therefore denies them.  To the extent any allegations in paragraphs 174 through 178 are not expressly admitted, they are denied.

Paragraph 174.        Charles Leclerc ("Leclerc") drove a Ferrari vehicle with the Halo in the 2019 U.S. Prix and a small windscreen, finished fourth in that race, and is currently under contract to Ferrari.

174.    FIA admits that Scuderia Ferrari competed in the FIA Formula One World Championship races in 2018 and 2019 at COTA with formula racing cars that included the Halo. FIA denies that Charles Leclerc used a "windscreen."  The remaining allegations in paragraph 174 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.  To the extent any allegations in paragraph 174 are not expressly admitted, they are denied.

**H. RBT**

The allegations in paragraphs 179 through 182 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the allegations in these paragraphs, and therefore denies them.  To the extent any allegations in paragraphs 179 through 182 are not expressly admitted, they are denied.

**I. RBR**

With the exception of paragraphs 184, 186, 193, and 195, to which FIA has a specific response, such response incorporating all of FIA's previous responses, FIA respond as follows to paragraphs 183 through 203:

Subject to the paragraphs listed below, the allegations in these paragraphs of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the allegations in these paragraphs, and therefore denies them.  To the extent any allegations in paragraphs 183 through 203 are not expressly admitted, they are denied.

Paragraph 184.        RBR was part of the F1 Strategy Group that participated in the Inaugural meeting at Biggin Hill, England in October 2013 (Christian Horner), voted in April 2016 to delay the Halo and look for alternatives, and participated in the July 2017 unanimous vote of the F1 Strategy Group to adopt the Halo for Formula One racing.

184.        FIA admits that RBR was a member of the F1 Strategy Group in April 2016 and participated in the unanimous vote of the F1 Strategy Group to adopt the Halo for Formula One Racing.  The remaining allegations in paragraph 184 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.  To the extent any allegations in paragraph 184 are not expressly admitted, they are denied.

Paragraph 186.        RBR competed in the 2018, 2019 and 2021 U.S. Grand Prix races in cars with Halos and small windscreens.

186.    FIA admits that RBR competed in the 2018, 2019 and 2021 U.S. Grand Prix races in cars with Halos.  FIA denies that RBR used any "windscreens."  To the extent any allegations in paragraph 186 are not expressly admitted, they are denied.

Paragraph 193.        RBR drivers used small windscreens in the 2018, 2019 and 2021 U.S. Grand Prix races.

193.    FIA denies that any formula racing cars used a "windscreen" at the 2018, 2019 and 2021 Formula One U.S. Grand Prix races.  To the extent any allegations in paragraph 193 are not expressly admitted, they are denied.

Paragraph 195.        RBR and Toro Rosso drivers used helmets in 2018, 2019 and 2021 U.S. Grand Prix racing.

195.    FIA admits that RBR and Toro Rosso drivers used helmets in the 2018, 2019 and 2021 Formula One U.S. Grand Prix races.

**J.  Dallara**

With the exception of paragraph 213, 217, 219, and 222, to which FIA has a specific response, such response incorporating all of FIA's previous responses, FIA respond as follows to paragraphs 204 through 222:

Subject to the paragraphs listed below, the allegations in these paragraphs of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the allegations in these paragraphs, and therefore denies them.  To the extent any allegations in paragraphs 204 through 222 are not expressly admitted, they are denied.

Paragraph 213.        Dallara engineering (Luca Pignacca) met with Mr. Nygaard on or about March 27, 2013, at FIA headquarters in Paris as part of the project that resulted in the Halo being chosen by FIA for driver safety in July 2017. Mr. Pignacca had a copy of Mr. Nygaard's EPO patent application at the March 27, 2013, meeting and discussed Mr. Nygaard's patent with him at the meeting. Mr. Pignacca was also sent a copy of the counterpart application for Mr. Nygaard's 2009 U.S. patent by Mr. Andy Mellor after the meeting. Mr. Pignacca, then and now, was Chief Designer for Dallara.

213.    FIA admits that Nygaard met at FIA headquarters in Paris on or about March 27, 2013. The remaining allegations in paragraph 213 are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the remaining allegations of paragraph 213 of the FAFSC, and therefore denies them. To the extent any remaining allegations relate to FIA, they are denied.

Paragraph 217.        The Aeroscreen has a windshield.

217.    Admitted.

Paragraph 219.        Dallara ships to the U.S. the component of the Aeroscreen made by Pankl in Austria. This component is the equivalent of the Formula One Halo..

219.    FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC. To the extent any allegation in paragraph 219 asserts the doctrine of equivalents, no further response to that allegation is required.  The remaining allegations in paragraph 219 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 222.        Haas used the "jagged windscreen" in the 2018 and 2019 U.S. Grand Prix races (and/or helmets and/or virtual windscreens).

222.    FIA denies that any formula racing car used a "windscreen" in the 2018 and 2019 Formula One U.S. Grand Prix races.  FIA admits that drivers for the Haas team used helmets in the 2018 and 2019 Formula One U.S. Grand Prix races.  To the extent any allegations in paragraph 222 are not expressly admitted, they are denied.

## III.    THE PATENT-IN-SUIT

Paragraph 223.        On March 29, 2004, Mr. Nygaard's original patent application for his inventions for vehicle safety was filed in Great Britain. The U.S. '178 patent issued in 2009. Among other things, Mr. Nygaard's inventions protect people from accidents caused by collisions, flying objects, and rollovers.

223.    FIA admits that U.S. Patent No. 7,494,178 issued on February 24, 2009.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the remaining allegations of paragraph 223 of the FAFSC, and therefore denies them.

Paragraph 224.        Mr. Nygaard's patent includes inventions for placement of a strengthening member in front of the driver in his line of sight without impairing the driver's vision, by adapting the structure to achieve BVT, which effectively edits out the obstruction from the driver's line of sight.

224.    Denied.

Paragraph 225.        The original application, subsequent filings in the USPTO, filings in other jurisdictions, and the issued '178 patent itself, included drawings that illustrated many examples of embodiments of Mr. Nygaard's inventions, including cars with what Defendants now refer to as the Halo. The Aeroscreen is a windscreen and frame combined with the Halo.

225.    FIA admits that the '178 Patent includes figures.  FIA denies that those figures illustrate cars with the Halo device.  FIA admits that the Aeroscreen includes a windscreen. FIA denies that the '178 Patent discloses or illustrates any invention. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the remaining allegations of paragraph 225 of the FAFSC, and therefore denies them.

Paragraph 226.        Shown below from left to right are figures 64 and 68 from the '178 patent, a depiction from FIA regulations of the Halo, and the Halo of the car driven by Leclerc in the 2018 Belgium Grand Prix. The marks on the Halo of Leclerc's car were caused by the tire of another F1 car that launched into the air in a multi-car accident during the race. The Halo received worldwide praise for saving Leclerc's life.



226.    FIA admits that paragraph 226 of the FAFSC includes an image of Figure 64 and Figure 68 of the '178 Patent.  FIA admits the second-from-the-right figure of paragraph 226 of the FAFSC includes a drawing of a Halo, though that drawing is not from the '178 Patent, and admits that the far right figure is an image of a Halo on Charles LeClerc's formula racing car.  FIA admits

that Mr. Leclerc had an accident at the 2018 FIA Formula One World Championship race in

Belgium.  The remaining allegations in paragraph 226 are related to entities other than FIA.  FIA

lacks knowledge or information sufficient to form a belief as to the truth of the substance of the

remaining allegations of paragraph 226 of the FAFSC, and therefore denies them.

Paragraph 227.          Mr. Nygaard contacted manufacturers, government regulators, FIA,
Delta, Formula One and others in the automobile industry to improve safety with his patent
pending inventions. He reached out to the FIA by 2005 to improve safety in motor sports. Over
the following years, he discussed his inventions and consulted with major car manufacturers,
including, among others, Aston Martin, Audi, Bentley, Daimler, Jaguar, Lotus, Magna Steyr,
Nissan, Rolls-Royce and Volvo, as well as consultants, government and others in the automobile
industry. Among others, Mr. Nygaard met with Daimler Group's engineers in Stuttgart, Germany
to discuss his patented inventions.

227.     FIA admits that Mr. Nygaard contacted FIA by 2005.  FIA denies that Mr. Nygaard

has any inventions.  FIA lacks knowledge or information sufficient to form a belief as to the truth

of the substance of the remaining allegations of paragraph 227 of the FAFSC, and therefore denies

them.  To the extent any allegation is not expressly admitted, it is denied.

Paragraph 228.          Mr. Nygaard directly contacted Mr. Ecclestone of Delta and
Formula One in 2006 about his patent applications to bring his safety inventions to Formula One
Grand Prix events. Mr. Nygaard wrote to Max Mosley, then president of FIA in 2005. Mr. Nygaard
also met with auto manufacturers and consultants at or around the annual Geneva, Switzerland
Auto Shows.

228.     FIA admits that Mr. Nygaard wrote to Max Mosely, then president of FIA.  FIA

lacks knowledge or information sufficient to form a belief as to the truth of the substance of the

remaining allegations of paragraph 228 of the FAFSC, and therefore denies them.  To the extent

any allegation is not expressly admitted, it is denied.

Paragraph 229.          As discussed above, after Mr. Surtees' untimely death and Mr.
Massa's injury, the FIA Institute focused on finding a solution for protection of the heads and
necks of drivers in FIA administered Formula motor sports, which became the Project.

229.     FIA admits that it, in conjunction with the FIA Institute and the Global Institute for

Motorsport Safety, has always been focused on safety in FIA administered Formula events. FIA

admits that it, along with others, conducted years of study and testing of multiple safety devices, including various devices to protect the heads and necks of drivers. FIA denies the remaining allegations of paragraph 229.

Paragraph 230.        As explained above, having failed in its attempts to find a suitable safety device, FIA and/or the FIA Institute met in November 2012 with Mr. Nygaard to consult on the BVT and driver safety innovations in his '178 patent. On December 17, 2012, FIA, Mr. Paddy Lowe and Mr. Nygaard and others met at McLaren in Woking, England, regarding his safety inventions and BVT technology. On March 27, 2013, Mr. Nygaard met with Dallara, and the FIA Institute at FIA's Paris Headquarters to implement his inventions for Formula racing. Mr. Nygaard discussed his patent at least at the March 27, 2013 meeting.

230.    FIA admits it met with Mr. Nygaard in November and December 2012, and again on March 27, 2013.  FIA denies the remaining allegations of paragraph 230.

Paragraph 231.        Prior to meeting Mr. Nygaard and studying his '178 patent, FIA, Dallara, and others in open cockpit racing, did not believe that an obstruction could be safely placed ahead of the driver in his field of vision. Mr. Pignacca had criticized the idea of placing an obstruction in front of the driver in an open cockpit car because it would interfere with the driver's line of sight.

231.    Denied.

Paragraph 232.        Mr. Nygaard's '178 patent and Mr. Nygaard taught FIA, Dallara, and others about his inventions to exploit BVT to place a strengthening pillar in front of the driver in an open cockpit race car.  In preparation for the October 2013 F1 Strategy Committee meeting at Formula One's Biggin Hill facility, Andy Mellor of the FIA Institute wrote a memorandum reporting on additional frontal protection for drivers, which included discussion of the Nygaard patent.  This memorandum was distributed to F1 Strategy Committee members as part of the working papers of the meeting, and all three remaining Defendants have now produced their copies of it.  Additional frontal protection for drivers was taken up at this meeting.

232.    The allegations of the first sentence of paragraph 232 are denied.  FIA admits that Andy Mellor prepared a memorandum that was provided to F1 Strategy Committee members.  FIA admits that additional frontal protection for drivers was discussed at the meeting identified in paragraph 232.  To the extent any allegation is not expressly admitted, it is denied.

## IV.   MR. NYGAARD REQUESTED COMPENSATION AFTER THE HALO WAS IMPLEMENTED

Paragraph 233.   As explained above, Mr. Nygaard was removed from the development of the Halo after he refused to give away his patent rights as demanded by FIA.

233.   Denied.

Paragraph 234.   Nonetheless, Mr. Nygaard's patented inventions were implemented in Formula 1 Grand Prix races in 2018.

234.   Denied.

Paragraph 235.   By October 17, 2018, Mr. Nygaard directly contacted top executives at Liberty Media and FOM about licensing his patent to compensate him for its use in the Halo and cars implementing the Halo.

235.   The allegations in paragraph 235 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 236.   FOM insisted in its replies to Mr. Nygaard that the Halo was an FIA issue, and he should contact the FIA.

236.   The allegations in paragraph 236 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.  Further, the term "insisted" is vague and confusing.  FIA therefore denies the allegations as written.

Paragraph 237.   Mr. Nygaard then turned to the FIA after his communications with FOM and FOWC about the '178 patent.

237.   The allegations in paragraph 237 of the FAFSC are related to entities other than FIA, including Mr. Nygaard.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 238.   Mr. Nygaard once again asked for a royalty-bearing license as he had in 2013. This time, however, the Halo was proven technology that saved at least two driver's lives in 2018 in Formula racing (Tadasuke Makino and Charles Leclerc).

238.    The allegations in the first sentence of paragraph 238 are vague and therefore denied.  FIA denies the allegation that "the Halo was proven technology that saved at least two driver's lives in 2013 Formula racing (Takasuke Makino and Charles Leclerc)."  The remaining allegations in paragraph 238 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.  To the extent any allegations in paragraph 238 are not expressly admitted, they are denied.

Paragraph 239.        Ultimately, Jean-Baptiste Pinton responded for the FIA in March 2019 with an email, and copied multiple people on his response, including those previously conFAFSCted in October by Mr. Nygaard at FOM and/or FOWC.

239.    FIA admits that Mr. Pinton responded for the FIA with a letter to Mr. Nygaard on March 12, 2019 that copied multiple people.  The remaining allegations in paragraph 239 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.  To the extent any allegations in paragraph 239 are not expressly admitted, they are denied.

Paragraph 240.        After being rejected by Mr. Pinton, Mr. Nygaard appealed to FIA's Mr. Jean Todt to reconsider Mr. Pinton's decision, and corresponded back and forth with Mr. Todt in 2019 about licensing his patents.

240.    FIA admits that Mr. Nygaard corresponded "back and forth" (to the extent that phrase is understood) with Mr. Todt in 2019 about a "license."  To the extent any allegations in paragraph 240 are not expressly admitted, they are denied.

Paragraph 241.        Even though Mr. Nygaard again asked FOM in 2018 and FIA in 2019 to compensate him for his patent rights, they flatly refused to do so. Neither of them made an offer to license. Neither F1, FOWC, Mercedes, Daimler, Ferrari, Dallara nor others sought a license, even though they knew the Halo would be deployed as implemented in cars in the U.S. Grand Prix at COTA, the U.S. ePrix on New York City roads, by F1's U.S.-based F1 team (Haas Racing), and by BMW Andretti and Geox Dragon Formula E teams based in the U.S., among other times and places in this country.

241.    FIA admits that Plaintiff made a licensing demand of FIA in 2019, which was refused. FIA was not required to request and/or obtain a license for any reason.  FIA admits that it knew that FIA regulations required a Halo be used on formula racing cars starting with the 2018 FIA Formula One World Championship Season.   FIA denies any remaining allegations in paragraph 241 to the extent that they relate to FIA.  All other allegations in paragraph 241 relate to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those remaining allegations, and therefore denies them.

Paragraph 242.        They also knew that many F1 Grand Prix vehicles with the Halo would be supplied from the U.S. abroad as disassembled into their custom components that make up all or substantial all of the invention including the vehicle chassis with the Halo, including those which have no substantial non-infringing use, other than for assembly into the invention.

242.    Denied.

Paragraph 243.        FIA and Daimler also knew that Formula E teams would ship their Spark Gen2 cars with the Halo disassembled so that the vehicle chassis implementing the Halo is a custom component, together with other components that if assembled in the U.S. would infringe the patent.

243.    With respect to the allegations in paragraph 243 related or directed to FIA, those allegations are expressly denied. The remaining allegations in paragraph 243 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

## V.   THE HALO ENABLES IMPROVEMENTS TO F1 GRAND PRIX RACING FOR 2022

To the extent that a response is required to this heading, it is denied.

Paragraph 244.        FOM and FOWC and others had concerns that Formula One Grand Prix racing was becoming less attractive to fans due to the lack of competition, with racing being dominated by Mercedes and RBR.

244.    The allegations in paragraph 244 are vague for being unrestricted as to time and therefore denied. The allegations in paragraph 244 of the FAFSC are related to entities other than

FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 245.        There was a press in the Formula One Grand Prix stakeholders to change rules to make racing more competitive by design changes to cars that would permit them to be driven closer to each other, have more opportunities to overtake each other, and put more emphasis on driver skill than with the current cars.

245.    FIA admits that design changes to formula racing cars for the 2022 Formula One racing season are intended to allow for those cars to more closely follow each other and increase overtakes.  The allegations in paragraph 245 otherwise are vague for being unrestricted as to time and for not identifying the specifics of the alleged "press" or the "stakeholders" in which this press supposedly existed.  Thus, FIA denies the allegations in this paragraph to the extent not expressly admitted.

Paragraph 246.        FIA adopted new regulations for construction of Formula One cars in February 2021 for the 2022 season based on research and development work done by FOM and FOWC to implement the goal of more competitive racing. The nature of enhancing and emphasizing competition based on drivers' skill was made possible by the greater safety provided to drivers by the Halo.

246.    FIA admits that the F1 Strategy Group sets the general strategy relating to the FIA F1 Championship and brings proposals to the F1 Commission, often based on the preparatory work of F1 Strategy Group working groups and advisory committees. FIA admits that the F1 Commission may approve or reject those proposals.  Based on that framework, new regulations for the 2022 FIA Formula One World Championship season are adopted by FIA.  FIA admits that the Formula One Motorsport team worked with the FIA on design changes to 2022 formula racing cars.  FIA denies that the only goal of the regulatory changes was more competitive racing and denies that the Halo made these regulatory changes possible.   To the extent any allegations in paragraph 246 are not expressly admitted, they are denied.

## VI.   NATURE OF THE ACTION

Paragraph 247.        All Defendants have been served or accepted service, and appeared.

247.    FIA admits they have been service and appeared. The remaining allegations in paragraph 247 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.  To the extent any allegations in paragraph 247 are not expressly admitted, they are denied.

Paragraph 248.        Defendants Mercedes, Ferrari, Hamilton and Leclerc were dismissed without prejudice based on the customer-suit exception, and Plaintiff has the right to proceed directly against each of them in the future if appropriate.

248.    The allegations in paragraph 248 call for a legal conclusion and do not require a response.  To the extent any allegations in paragraph 248 are not expressly admitted, they are denied.

Paragraph 249.        Dallara was dismissed from this case for lack of personal jurisdiction on July 16, 2021. Plaintiff has moved for reconsideration of that order.

249.    Admitted.

Paragraph 250.        This is a case for direct and indirect patent infringement, literally or under the doctrine of equivalents, against each of the Defendants of claims 1, 2, and 4 of U.S. Patent No. 7,494,178, titled "Vehicle And a Strengthening Member For a Vehicle," pursuant to Title 35 United States Code, Section 271(a)-(c) & (f)(1), (f)(2).

250.    FIA denies that this is a case against it pursuant to Title 35, United States Code, Section 271(c).  FIA denies that this is a case for "direct" patent infringement against it.  FIA denies that the doctrine of equivalents is properly asserted in this case and has filed a motion to strike assertions of the doctrine of equivalents in the TAC.  To the extent any allegation in paragraph 250 asserts the doctrine of equivalents, no further response to that allegation is required. FIA admits that the face of the '178 Patent includes a title of "Vehicle and a Strengthening Member For a Vehicle."  The remaining allegations in paragraph 250 of the FAFSC are related to entities

other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of

the substance of those allegations and therefore denies them.  To the extent any allegations in

paragraph 250 are not expressly admitted, they are denied.

Paragraph 251.          The patent issued on February 24, 2009. Mr. Nygaard has always
been the owner of all right, title, and interest in and to the '178 patent. This is an exceptional case
as to Defendants FIA, FOM, FOWC, Mercedes, Daimler, Ferrari, and Dallara because they had
notice prior to suit of the patent and infringed without regard for Mr. Nygaard's rights. RBT had
notice of the patent no later than October 2013, but designed the Aeroscreen with a Halo in 2019
and participated in testing of it and promotion of it in the U.S. in 2019, willfully inducing
infringement by each IndyCar team and driver during the 2020 and 2021 racing season from the
opening race on June 6, 2020 to the end of the season. Upon information and belief, RBT continues
to promote the Aeroscreen in, among other things, IndyCar racing and is poised to do so in the
2022 season, making its post-suit conduct not only willful but also rendering it an exceptional case.
RBR and drivers under contract to RBR participated in the 2021 U.S. Grand Prix, all of its drivers
used cars with Halos and windscreens.

251.     To the extent allegations in paragraph 251 call for a legal conclusion, no response

is required.  FIA admits that the face of the '178 Patent includes an issue date of February 24,

2009.  At this time, FIA lacks knowledge or information sufficient to form a belief as to the truth

of whether "Mr. Nygaard has always been the owner of all right, title, and interest in and to the

'178 patent," and therefore deny that allegation.  FIA denies that this is an exceptional case as to

FIA or that they infringe.  FIA denies that all future U.S. Formula One racing will result in

infringement of the '178 Patent.  The remaining allegations in paragraph 251 of the FAFSC are

related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief

as to the truth of the substance of those allegations and therefore denies them.  To the extent any

allegations in paragraph 251 are not expressly admitted, they are denied.

Paragraph 252.          This is also an action for a Declaratory Judgment pursuant to Title
35, Sections 2201 and 2202 of the United States Code.

252.     FIA admits that Plaintiff seeks a Declaratory Judgment pursuant to Title 35,

Sections 2201 and 2202 of the United States Code.

Paragraph 253.        Mr. Nygaard asks for a declaration that a Halo built in accordance with the FIA's 2022 regulations, and implemented on a Formula 1 car as shown by FOM's model and videos in July 2021, if raced in events as planned in the Miami and Austin areas in 2022, in configurations with windscreens, would directly infringe the '178 patent, and FOM's, FWOC's and FIA's conduct would be inducement to infringe. FOM, FOWC and FIA will also be liable for infringement of Section 271(f)(1) and (f)(2) when the cars and equipment are supplied to venues outside of the U.S. after those events.

253.    FIA denies that Plaintiff seeks a declaration of direct infringement against it.  FIA admits that Plaintiff seeks a declaration as described in paragraph 253, but denies that Plaintiff is entitled to such a declaration.

Paragraph 254.        Mr. Nygaard also asks for a declaration that such infringement would be willful.

254.    FIA admits that Plaintiff seeks a declaration as described in paragraph 254, but denies that Plaintiff is entitled to such a declaration.

## VII.    JURISDICTION AND VENUE

Paragraph 255.        This action arises under the patent laws of the United States, Title 35 of the United States Code ("U.S.C.") § 101 *et seq.*

255.    Admitted.

Paragraph 256.        This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

256.    Admitted.

Paragraph 257.        This Court has personal jurisdiction over each Defendant under the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code §§ 17.041 *et seq.* because each of them has infringed the patent directly and/or indirectly in the State of Texas, and Fed. R. Civ. P. 4. Only Dallara and Charles Leclerc contested personal jurisdiction. Leclerc was dismissed under the customer exception and so this is a moot issue as to him. Dallara contested personal jurisdiction and was dismissed for lack of personal jurisdiction on July 16, 2021. Based on the facts herein and as shown in Plaintiff's Response, Sur-Reply, additional evidence, and Motion for Reconsideration, and the record, the Court has personal jurisdiction over Dallara.

257.    FIA admits that this Court has specific personal jurisdiction over it but denies that it has infringed the patent directly and/or indirectly in the State of Texas or anywhere.  The remaining allegations in paragraph 257 of the FAFSC are related to entities other than FIA.  FIA

lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.  To the extent any allegations in paragraph 257 are not expressly admitted, they are denied.

Paragraph 258.        Venue is proper in this judicial district under 28 U.S.C. §§ 1391(c), 1400(b), because Defendants are not citizens of the United States and may be sued in any judicial district or any judicial district where they are subject to personal jurisdiction. No Defendant challenged or sought to transfer venue.

258.    FIA admits that venue is proper against it  in this judicial district and that it has not challenged or sought to transfer venue.  The remaining allegations in paragraph 258 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.  To the extent any allegations in paragraph 258 are not expressly admitted, they are denied.

## VIII.   <u>JOINDER</u>

Paragraph 259.        None of the Defendants have objected to joinder.

259.    FIA admits that it has not objected to improper joinder, but reserves the right to do so.

Paragraph 260.        The Defendants were properly joined in this action under Section 299 of Title 35, because Mr. Nygaard's claims result from their overlapping development of products that make-up or include the Halo and also uses of the Halo at COTA in Austin, Texas. Mr. Nygaard's claims are based on common and/or overlapping facts showing Defendants directly or indirectly infringed claims 1, 2 and 4 in regard to preparations for, events at, and acts following, the 2018, 2019 and 2021 U.S. Grand Prix; the 2019 and 2021 U.S. ePrix; the 2020 NTT IndyCar Practice at COTA and Texas Motor Speedway, and races in 2020 in Texas and elsewhere; and other times and places in this Country as alleged herein.

260.    Denied.

Paragraph 261.        FOM, FOWC, RBT, RBR, Ferrari, Dallara, Mercedes and Daimler all contend they were all implementing FIA regulations in making and using the Halo.

261. The allegations in paragraph 261 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 262. Mr. Nygaard's right to relief is asserted against each Defendant acting together with multiple other Defendants, who infringed or induced infringement, or in the alternative, with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences relating to the making, using, selling, offering for sale, or importing into the U.S. the patented invention, as well as causing to be supplied from the U.S. components, including those that have no substantial non-infringing use, and would infringe if assembled in the U.S., and inducing others to do so.

a) There are questions of fact common to all Defendants including at least:

i. Whether vehicles that implement the Halo or the Aeroscreen based on the Halo infringe claims 1, 2 and 4 of the '178 patent, literally or under doctrine of equivalents?

ii. Whether the components exported from the U.S. by each F1 team from COTA abroad for other Grand Prix races constitute all or substantially all of the invention in claim 4 if they had been assembled in the U.S.?

iii. Whether components of the invention with no substantial non-infringing use which were exported from COTA abroad for other Grand Prix races would infringe claim 4 if assembled in the U.S.?

iv. Whether the Halo prevented substantial injuries to, or death of, Charles Leclerc at the 2018 Belgian Grand Prix, and other drivers in Formula racing in 2018 and 2019?

v. Whether the Aeroscreen saved drivers in the NTT Indy500 Circuit races in Iowa in 2020, and Alabama and Texas in 2021, from death or injury?

vi. Whether and to what extent RBR, RBT, Dallara, IndyCar, FOM, FIA, Ferrari, Delta, Mercedes, Daimler and others shared information regarding the Halo, including, but not limited to, information about Mr. Nygaard and/or his patent?

vii. Dallara's, Mercedes', FIA's, RBT's, RBR's, Ferrari's and Mr. Nygaard's roles in developing the original Halo prototype, other work on the Halo and the Aeroscreen, as well as the 2019-2020 RBT Aeroscreen kits for IndyCar, and other work on parts and equipment to adapt Dallara chassis for IndyCar and for Formula E, and Formula 3 to meet the strength requirements for both IndyCar and FIA.

viii. Whether and when FOWC, FOM and teams learned of Mr. Nygaard's patent and also licensing offers to FIA in 2013 and/or 2018?

ix. Whether FIA, FOM, FOWC, Mercedes, Daimler, Ferrari, RBT, RBR, and Dallara willfully infringed Mr. Nygaard's patent rights at Formula Grand Prix events at COTA, Formula E, Formula 3 and 4 events, and the NTT IndyCar Series Official Practice at COTA, and other places in the United States, knowing before those events about the '178 patent, their direct or

indirect infringement, literally or by doctrine of equivalents, and that they were not licensed?

x.     Whether the greater protection provided by the Halo was necessary to permit for changes in the February 2021 Formula One rules for 2022?

xi.    Whether, and if so how, the revenues and other financial terms of the contracts among RBT, Dallara, their IndyCar customers and others, evidence Defendants' actions, intent, motivations, willfulness and damages owed to Mr. Nygaard?

xii.   Whether FIA's, FOM's, FOWC's, RBT's, RBR's, Mercedes', Daimler's, Ferrari's and Dallara's participation in, and/or monitoring of, the Project put them on notice of the '178 patent?

xiii.  Whether FIA's, FOM's, FOWC's, RBT/RBR's, Mercedes' and Ferrari's involvement in the F1 Strategy Group put them on notice of Mr. Nygaard's patent (including, but not limited to, the October 2013 memorandum by Mr. Mellor included in the working papers for the Inaugural F1 Strategy Committee meeting)?

xiv.   Whether and how facts about the design, modification and costs of infringing open cockpit vehicles built for use in Formula 1, Formula E, and other Formula racing activities in the U.S. by car owners and by drivers during races and related events evidence infringement, willfulness and damages in this case?

xv.    Whether Defendants' conFAFSCts with Dallara for designing and making components to install and upgrade chassis for the Halo for Formula Events or the Aeroscreen in IndyCar events, and afterward in one or more of the 2018 and 2019 U.S. Grand Prix races at COTA, the 2020 NTT IndyCar Series Official Practices at COTA and Texas Motor Speedway, the 2020 opening NTT Indy500 Race in Texas and later races, or 2019 Formula E ePrix on New York roads, or making or using the invention by Haas Racing in the U.S., or Formula E teams in the U.S. (including Mercedes' Formula E team), or Formula 3 and 4 teams, constitute direct or indirect infringement of the '178 patent, literally or by doctrine of equivalents?

xvi.   Whether and when RBR and RBT obtained knowledge of the Ferrari patent applications regarding a design like the Halo deployed in a Ferrari sports car, which was published in 2019?

xvii.  Whether the media and social media strategy to grow Formula 1 Grand Prix Racing in the U.S. was enabled or otherwise benefited from the inventions?

262.  FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC. To the extent any allegation in paragraph 262, including sub-paragraphs (a)(i)-(xvii), asserts the doctrine of equivalents, no further response to that allegation is required. FIA denies the remaining allegations in paragraph 262, including sub-paragraphs (a)(i)-(xvii), of the FAFSC.

## COUNT I

### Infringement of the '178 patent by FIA

Paragraph 263.        Mr. Nygaard incorporates by reference each and every allegation in the preceding paragraphs.

263.     FIA incorporates by reference its responses to paragraphs the preceding paragraphs as if fully set forth herein.

Paragraph 264.        Mr. Nygaard incorporates Exhibits A and B herein.

264.     Admitted.

Paragraph 265.        FIA has induced infringement of the '178 patent claims 1, 2, and 4 literally or alternatively by equivalents in regard to vehicles implementing the Halo, and infringed claim 4 literally or by equivalents under Section 271(f). All allegations of infringement against FIA include literal infringement or alternatively, infringement under the doctrine of equivalents, under the Court's March 22, 2021 claim construction.

265.     FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC. To the extent any allegation in paragraph 265 asserts the doctrine of equivalents, no further response to that allegation is required.  FIA denies the remaining allegations in paragraph 265.

Paragraph 266.        The elements of claim 1 of the '178 patent below, with limitations bold and underlined, are met literally or by doctrine of equivalents **by the Halo**, as shown below by the matters described in the bracketed material, see Exhibits A (the '178 patent) and B (charts illustrating the application of the claims):

**A strengthening member** [the Halo **for use in a road vehicle** [open cockpit race car], **for fixing to a structure of the vehicle, and for extending in front of the driver's position** [the vertical member (central pillar) of the Halo is fixed to the car at a point in front of the cockpit within the claim construction literally or by equivalents], **the strengthening member being dimensioned so that, when in use, the strengthening member will not prevent the driver from seeing an object which is at least 2 m from the front windscreen,** [Formula One drivers and teams used windscreens. If the small windscreens are not windshields as in the claim construction order, then for the purposes of the asserted claims they satisfy the limitation of a windshield as they deflect wind and provide a dimensional point of reference. If a car lacked any physical windscreen of any kind, then the visor on the front of the drivers' helmets are the equivalent of a windshield. Alternatively, the air flow configuration (e.g., nose and FIA rules on dimensions of cockpit) for Formula One cars is the equivalent of a windscreen. These alternative equivalents all function in the same way in terms of fixing orientation of the strengthening member so that the driver can see objects, e.g., other cars, at this distance when the Halo is implemented

on the vehicle. They also function in the same way as they are all placing the center pillar ahead of the driver in his field of vision with only minimal, if any, obstruction, so that binocular vision will edit out the obstruction] **when the driver uses binocular vision** [the driver uses binocular vision, e.g., drivers report that the vertical member of the Halo that extends in the front of the cockpit does not interfere with their vision when driving] and **without requiring the driver to move the driver's head** [the driver does not need to move his or her head to see objects when driving, e.g., other cars in front while driving or its equivalent], wherein the strengthening member has the form of a triangular prism which has been sheared in a vertical plane or **the form of a truncated sheared triangular pyramid** [the Halo has the form of a truncated sheared triangular pyramid as formed by its angled vertical member in conjunction with the other angled portion or its equivalent].

266.    FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC. To the extent any allegation in paragraph 266, or Exhibit B, asserts the doctrine of equivalents, no further response to that allegation is required.  FIA denies the remaining allegations in paragraph 266.  FIA also denies that the Halo meets the limitations of Claim 1, as Plaintiff attempts to show in the claim charts in Exhibit B.

Paragraph 267.        Claim 2 of the '178 patent is infringed literally or by doctrine of equivalents by **the Halo**, see Exhibits A and B:

A **strengthening member** [the Halo] for mounting in a vehicle [open cockpit race car], **formed of at least three first linearly extending structural units placed in a triangular arrangement, for extending from the front structure of the vehicle** [an end of each of the three first linearly extending structural units extends from the front structure of the vehicle] and **second linearly extending structural unit joining the at least three first linearly extending units** [portion of the Halo extending around the cockpit], the second linearly extending structural unit being not horizontal [slanted], and **wherein the first linearly extending structural units of the strengthening member have a width not exceeding 65 mm** [central pillar width of the Halo equals to or is less than 65mm], **the strengthening member having a connection for fixing the strengthening member to the vehicle** [the Halo is fixed to the vehicle by at least one connection], whereby, **when mounted in the vehicle, the strengthening member extends obliquely to the vertical direction of the vehicle** [all angles on the Halo are oblique to (slanted with respect to) the vertical direction of the vehicle].

267.    FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC. To the extent any allegation in paragraph 267, or Exhibit B, asserts the doctrine of equivalents, no further response to that allegation is required.  FIA denies the remaining allegations in paragraph

267.  FIA also denies that the Halo meets the limitations of Claim 2, as Plaintiff attempts to show in the claim charts in Exhibit B.

Paragraph 268.        Claim 4 of the '178 patent is infringed literally or by doctrine of equivalents **by vehicles incorporating the Halo**, see Exhibits A and B:

**A road vehicle** [open cockpit race car] **comprising at least one strengthening member** [the Halo] **fixed to a structure of the vehicle** [the vertical member of the Halo is fixed to the front of the automobile chassis] and **extending in front of the driver's position** [the vertical member (central pillar) of the Halo is fixed to the car at a point in front of the cockpit within the claim construction literally or by equivalents], **wherein the strengthening member is dimensioned so that the strengthening member will not prevent the driver from seeing an object which is at least two meters from the front windscreen** [Formula One drivers and teams used windscreens. If the small windscreens are not windshields as in the claim construction order, then for the purposes of the asserted claims they satisfy the limitation of a windshield as they deflect wind and provide a dimensional point of reference. If a car lacked any physical windscreen of any kind, then the visor on the front of the drivers' helmets are the equivalent of a windshield. Alternatively, the air flow configuration (e.g., nose and FIA rules on dimensions of cockpit) for Formula One cars is the equivalent of a windscreen. These alternative equivalents all function in the same way in terms of fixing orientation of the strengthening member so that the driver can see objects, e.g., other cars, at this distance when the Halo is implemented on the vehicle. They also function in the same way as they are all placing the center pillar ahead of the driver in his field of vision with only minimal, if any, obstruction, so that binocular vision will edit out the obstruction], **when the driver uses binocular vision** [the driver uses binocular vision, e.g., drivers report that the vertical member of the Halo that extends in the front of the cockpit does not interfere with their vision when driving] and **without requiring the driver to move the driver's head** [the driver does not need to move his or her head to see objects when driving, e.g., other cars in front while driving or its equivalent], wherein the strengthening member has the form of a triangular prism which has been sheared in a vertical plane **or a truncated sheared triangular pyramid** [the Halo has the form of a truncated sheared triangular pyramid as formed by its angled vertical member in conjunction with the other angled portion or its equivalent].

268.    FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC. To the extent any allegation in paragraph 268, or Exhibit B, asserts the doctrine of equivalents, no further response to that allegation is required.  FIA denies the remaining allegations in paragraph 268.  FIA also denies that the Halo meets the limitations of Claim 4, as Plaintiff attempts to show in the claim charts in Exhibit B.

Paragraph 269.        Defendant FIA knew of the '178 patent as early as 2005 from correspondence to Mr. Max Mosley from Plaintiff regarding his applications. FIA knew no later

than 2013 of the '178 patent, through Mr. Nygaard's direct involvement in the design of the Halo and his request that FIA license the '178 patent. It also knew that the design of the Halo was based on Mr. Nygaard's '178 patent or would nonetheless infringe it from their meetings and subsequent communications with him.

269.    Denied.

Paragraph 270.    Defendant FIA induced infringement of claims 1, 2, and 4 of the '178 patent in violation of Section 271(b) by participating in the F1 Strategy Group's adoption of the Halo requirement for all F1 vehicles used in Grand Prix races, and later implementing rules requiring the Halo, which resulted in direct infringement by each of the ten teams making and using the inventions in claims 1, 2 and 4, and twenty drivers using the invention in claim 4 by participating in the U.S. Grand Prix events at COTA from October 19-21, 2018, November 1-3, 2019, and October 21-24, 2021, because the vehicles incorporated the Halo.

270.    Denied.

Paragraph 271.    Defendant FIA also induced direct infringement of claims 1, 2, and 4 of the '178 patent in 2018, 2019 and 201 by causing all ten teams to have imported their F1 vehicles with the Halo into the U.S. for the 2018, 2019 and 2021 U.S. Grand Prix.

271.    Denied.

Paragraph 272.    Defendant FIA also infringed claim 4 of the '178 patent in 2018, 2019 and 2021 by causing all ten teams to have supplied the chassis of their F1 vehicles with the Halo and other components for assembly outside of the U.S. in a manner that actively induced the combination of such substantial portion of components outside the United States and in a manner that would infringe if combined in the U.S. in violation of Section 271(f)(1). Further, or in the alternative, causing to be supplied abroad the vehicles' chassis with the Halo as custom components that were especially made and especially adapted for use in the patented '178 inventions and not a staple article or commodity of commerce suitable for substantial non-infringing use, where such components were uncombined in whole or in part. Upon information and belief, FIA knew that the customized components were especially made and especially adapted for use in the patented '178 inventions, and intended that such components would be combined outside of the United States in a manner that would infringe the '178 patent if such combination occurred within the United States in violation of Section 271(f)(2):

a)  After the 2018 and 2021 U.S. Grand Prix to Mexico for the Mexican Grand Prix.
b)  After the 2019 U.S. Grand Prix to Brazil for the Brazilian Grand Prix

272.    Denied.

Paragraph 273.    Defendant FIA induced the Haas racing team to directly infringe, directly or by equivalents, claims 1, 2, and 4 of the '178 patent by making and using vehicles with the Halo in and around Haas' facilities in the U.S. after the 2018 U.S. Grand Prix.

273.    FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC. To the extent any allegation in paragraph 273 asserts the doctrine of equivalents, no further response to that allegation is required.  FIA denies the remaining allegations in paragraph 273.

Paragraph 274.        Defendant FIA also caused Haas F1 team's cars to be supplied from the U.S. a substantial portion of the components of the patented inventions, including vehicle chassis with the Halo in claim 4, abroad for assembly into vehicles with the Halo in a manner that actively induced the combination of such components outside the United States and in a manner that would infringe, literally or by equivalents, if combined in the U.S., for use in Grand Prix events outside of the U.S. in 2018, 2019, and 2020 in violation of Section 271(f)(1). Alternatively, or in addition, FIA caused to be supplied from the U.S. custom components [vehicle chassis with the Halo] that were especially made and especially adapted for use in the patented '178 inventions and not a staple article or commodity of commerce suitable for substantial non-infringing use, where such components were uncombined in whole or in part. Upon information and belief, FIA knew that the customized components were especially made and especially adapted for use in the patented '178 inventions, and intended that such components would be combined outside of the United States in a manner that would infringe the '178 patent if such combination occurred within the United States, for the 2018, 2019 and 2020 Grand Prix events in violation of 271(f)(2).

274.    FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC. To the extent any allegation in paragraph 274 asserts the doctrine of equivalents, no further response to that allegation is required.  FIA denies the remaining allegations in paragraph 274.

Paragraph 275.        Defendant FIA further induced direct infringement, literally or by equivalents, of claims 1, 2, and 4 by teams and drivers having used cars in the 2019 and 2021 U.S. ePrix events in New York City events that implemented the Halo literally and by equivalents. *See* Exhibits A & B.

275.    FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC. To the extent any allegation in paragraph 275 asserts the doctrine of equivalents, no further response to that allegation is required.  FIA denies the remaining allegations in paragraph 275.

Paragraph 276.        Defendant FIA also induced direct infringement, literally or by equivalents, of claims 1, 2, and 4 by all Formula E teams by requiring them to import their vehicles implementing the Halo following the 2019 Swiss ePrix and 2021 ABB New York City E-PRX race.

276.   FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC. To the extent any allegation in paragraph 276 asserts the doctrine of equivalents, no further response to that allegation is required.  FIA denies the remaining allegations in paragraph 276.

Paragraph 277.   Defendant FIA also induced infringement of the U.S.-based Formula E teams BMW Andretti Motor Sport and Geox Dragon to directly infringe, literally or by equivalents, claims 1, 2 and 4 by making and using cars implementing the Halo in the U.S. for the 2019 U.S. ePrix, 2019-2020, and 2020-2021 Formula E seasons.

277.   FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC. To the extent any allegation in paragraph 277 asserts the doctrine of equivalents, no further response to that allegation is required.  FIA denies the remaining allegations in paragraph 277.

Paragraph 278.   Defendant FIA also infringed claim 4 of the '178 patent, literally or by equivalents, when it caused to be supplied from the U.S. a substantial portion of the components of the invention in violation of Section 271(f)(1), that is the chassis with the Halo atFAFSChed and other components, for assembly abroad in a manner that actively induced the combination of such components outside the United States and in a manner that would infringe if combined in the U.S. for the Formula E 2018-2019, and 2020-2021 seasons. In addition, or alternatively, FIA caused to be supplied from the U.S. the chassis of vehicles with the Halo as custom components that were especially made and especially adapted for use in the patented '178 inventions and not a staple article or commodity of commerce suitable for substantial non- infringing use, where such components were uncombined in whole or in part. Upon information and belief, FIA knew that the customized components were especially made and especially adapted for use in the patented '178 inventions, and intended that such components would be combined outside of the United States in a manner that would infringe, literally or by equivalents, the '178 patent if such combination occurred within the United States in violation of Section 271(f)(2):

a)   By BMW Andretti Formula E team from the U.S. in 2018 and 2019 to Saudi Arabia for the 2018-2019 and 2019-2020 ePrix seasons.
b)   By Geox Dragon Formula E team from the U.S. in 2018 and 2019 to Saudi Arabia for the 2018-2019, 2019-2020 and 2020-2021 ePrix seasons.
c)   By BMW Andretti Formula E team from the U.S. in 2020 for the Berlin ePrix. And from the U.S. in 2021 to Saudi Arabia.
d)   By Geox Dragon Formula E team from the U.S. in 2020 for the Berlin ePrix. And from the U.S. in 2021 to Saudi Arabia.
e)   By teams Envision Virgin, Nissan, Audi Sport, DS Techeetah, Mahindra Racing, NIO Formula E, Venturi Formula E, Panasonic Jaguar, and HWA Racelab Formula E team from the U.S. in 2019 and 2021 following the U.S. ePrix to their respective facilities in other countries.

278.   FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC. To the extent any allegation in paragraph 278 asserts the doctrine of equivalents, no further response to that allegation is required.  FIA denies the remaining allegations in paragraph 278.

Paragraph 279.          Defendant FIA also induced all teams and drivers competing in the 2018 F3 Americas World Championship at COTA, and other races in and after 2018 in the U.S. to directly infringe, literally or by equivalents, claims 1, 2, and 4, by using cars that implemented the Halo in those events.

279.   FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC. To the extent any allegation in paragraph 279 asserts the doctrine of equivalents, no further response to that allegation is required.  FIA denies the remaining allegations in paragraph 279.

Paragraph 280.          Defendant FIA is liable for infringement of the '178 patent, directly or indirectly, literally or by doctrine of equivalents, and its infringement has been and continues to be willful in nature.

280.   FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC. To the extent any allegation in paragraph 280 asserts the doctrine of equivalents, no further response to that allegation is required.  FIA denies the remaining allegations in paragraph 280.

Paragraph 281.          Mr. Nygaard is entitled to actual and enhanced damages for this willful infringement pursuant to § 284, and attorneys' fees and costs under 35 U.S.C. § 285 as a result of the infringement of the '178 patent from Defendant FIA because this is an exceptional case.

281.   Denied.

Paragraph 282.          Therefore, Mr. Nygaard is entitled to actual and/or compensatory damages, reasonable royalties, pre-judgment and post-judgment interest, enhanced damages, attorneys' fees, and costs and any other relief to which he is entitled to receive from Defendant FIA.

282.   Denied.

## COUNT TWO

## Infringement of the '178 Patent by FOM and FOWC

Paragraph 283.          Mr. Nygaard incorporates by reference each and every allegation in the preceding paragraphs.

283.    FIA incorporates by reference its responses to paragraphs the preceding paragraphs as if fully set forth herein.

Paragraph 284.        FOM and FOWC have infringed the '178 patent claims 1, 2, and 4 literally or alternatively by equivalents. All allegations of infringement against FOM and FOWC include literal infringement or alternatively, infringement under the doctrine of equivalents.

284.    FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC. To the extent any allegation in paragraph 284 asserts the doctrine of equivalents, no further response to that allegation is required.  FIA denies any infringement of the '178 patent.  The remaining allegations in paragraph 284 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 285.        The patent is attached as Exhibit A and the amended illustrative charts attached as Exhibit B, and they are incorporated by reference herein. In particular, Mr. Nygaard reurges the infringement details from paragraphs 264–283 in Count One.

285.    FIA admits that Exhibit A is a copy of the '178 Patent and that Exhibit B contains Plaintiffs' claim charts.  FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC.  To the extent any allegation in Exhibit B asserts the doctrine of equivalents, no further response to that allegation is required.  FIA denies any infringement.  FIA reurges its responses to paragraphs 263-282.

Paragraph 286.        Defendants FOM and FOWC knew of the '178 patent as early as 2006 through communications between Mr. Nygaard and their predecessors Formula One and Delta through Mr. Ecclestone. Upon information and belief, they also knew about Mr. Nygaard's and the FIA Institute's licensing discussions in 2013; also through their predecessor entities' participation in the F1 Strategy Group they would have known about the patent by 2013; and finally were informed by FIA of Mr. Nygaard's claims of infringement by FIA in late 2018 and early 2019.

286.    The allegations in paragraph 286 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 287.        Defendant FOM and FOWC induced direct infringement in violation of Section 271(b) by each requiring that each of the ten teams and twenty drivers participating in the U.S. Grand Prix events at COTA from October 19-21, 2018, November 1-3, 2019, and October 21-24, 2021, to use vehicles implementing the Halo in all races, practices and qualifying rounds each year, which caused them to directly infringe claims 1, 2, and 4 of the '178 patent.

287.    FIA denies any infringement of the '178 patent.  The allegations in paragraph 287

of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient

to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 288.        Defendants FOM and/or FWOC assist with, subsidize, and/or support transportation and logistics of movement of teams, personnel and equipment between and among Grand Prix Circuit races, including the U.S. Grand Prix Races.

288.    The allegations in paragraph 288 of the FAFSC are related to entities other than

FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance

of those allegations and therefore denies them.

Paragraph 289.        Defendants FOM and FOWC also induced direct infringement of claims 1, 2, and 4 of the '178 patent in 2018, 2019 and 2021, by requiring all ten teams to import the chassis of their F1 vehicles with the Halo for the U.S. Grand Prix, which infringed claims 1 and 2 of the '178 patent, and assisting them with the transportation of their vehicles and equipment. They also induced the teams to make and use their cars infringing claim 4. They likewise induced the drivers of the cars in the U.S. Grand Prix races in 2018, 2019 and 2021 to use, and thereby infringe claims 1, 2 and 4 of the patent.

289.    FIA denies any infringement of the '178 patent.  The allegations in paragraph 289

of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient

to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 290.        Defendants FOM and FOWC caused all ten F1 Grand Prix teams' vehicle chassis implementing the Halo and other substantial components of the invention to be supplied from the U.S. in each of 2018, 2019 and 2021 following the U.S. Grand Prix at COTA, for assembly abroad for use in subsequent races, infringing claim 4 in violation of Sections 271(f)(1). Alternatively, or in addition, the chassis with the Halo are custom components that were especially made and especially adapted for use in the patented '178 inventions and not a staple article or commodity of commerce suitable for substantial non-infringing use, where such components were uncombined in whole or in part. Upon information and belief, FOM and FOWC knew that the customized components were especially made and especially adapted for use in the patented '178 inventions, and intended that such components would be combined outside of the

United States in a manner that would infringe claim 4 of the '178 patent if such combination occurred within the United States, and FOM and FOWC caused those components to be supplied from the U.S. for assembly abroad in a manner that would infringe if done in the U.S.:

    a)  In 2018 and 2021 from COTA to Mexico for the Mexican Grand Prix.
    b)  In 2019 from COTA to Brazil for the Brazilian Grand Prix.

      290.    FIA denies any infringement of the '178 patent.  The allegations in paragraph 290

of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient

to form a belief as to the truth of the substance of those allegations and therefore denies them.

      <u>Paragraph 291.</u>     Defendants FOM and FOWC induced the Haas racing team to infringe claims 1, 2, and 4 of the '178 patent by making and using vehicles with the Halo in and around Haas' facilities in the U.S. and at the 2018, 2019 and 2021 U.S. Grand Prix Race.

      291.    FIA denies any infringement of the '178 patent.  The allegations in paragraph 291

of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient

to form a belief as to the truth of the substance of those allegations and therefore denies them.

      <u>Paragraph 292.</u>     Defendants FOM and FOWC also infringed by causing Haas to supply from the U.S. substantial components of the inventions in claim 4 abroad for assembly into vehicles with the Halo in a manner that would infringe if in the U.S., for use in foreign Grand Prix events. Alternatively, or in addition, caused to be supplied from the U.S. custom components with no substantial non-infringing use but for the inventions, for assembly abroad, in a manner that would infringe claim 4 if, in the United States, for Grand Prix events. FOM and FOWC assisted in transportation of these materials for these purposes.

      292.    FIA denies any infringement of the '178 patent.  The allegations in paragraph 292

of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient

to form a belief as to the truth of the substance of those allegations and therefore denies them.

      <u>Paragraph 293.</u>     Alternatively, in the event all components were not assembled into an infringing configuration at the time of import for the 2018, 2019 and 2021 U.S. Grand Prix, then FOM and FOWC induced the teams to directly infringe claim 4 by assembling them into F1 cars that were to compete in the U.S. Grand Prix events in 2018 and 2019, and assisted in that transportation.

293.     FIA denies any infringement of the '178 patent.  The allegations in paragraph 293 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 294.     Defendants FOM and FOWC caused to be supplied from the U.S. substantial components that if assembled in the U.S. would infringe claim 4 of the '178 patent; or in addition or alternatively, custom components with no substantial non-infringing use other than assembly in a manner that would infringe if done in the U.S., by assisting in transportation of the vehicles and/or chassis with the Halo for all ten teams as follows:

a)     In October 2018 and October 2021 from the United States following the U.S. Grand Prix at
COTA to Mexico.
b)     In November 2019 from the United States following the U.S. Grand Prix at
COTA to Brazil.

294.     FIA denies any infringement of the '178 patent.  The allegations in paragraph 294 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 295.     Defendants FOM and FOWC are liable for infringement of the '178 patent, directly or indirectly, literally or by doctrine of equivalents, and its infringement has been and continues to be willful in nature.

295.     FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC. To the extent any allegation in paragraph 295 asserts the doctrine of equivalents, no further response to that allegation is required.  FIA denies any infringement of the '178 patent.  The remaining allegations in paragraph 295 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 296.     Mr. Nygaard is entitled to actual and enhanced damages for this willful infringement pursuant to § 284, and attorneys' fees and costs under 35 U.S.C. § 285 as a result of the infringement of the '178 patent from Defendants FOM and FOWC because this is an exceptional case.

296.    FIA denies any infringement of the '178 patent.  The allegations in paragraph 296 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

Paragraph 297.        Therefore, Mr. Nygaard is entitled to actual and/or compensatory damages, reasonable royalties, pre-judgment and post-judgment interest, enhanced damages, attorneys' fees, and costs and any other relief to which he is entitled to receive from Defendants infringement of the '178 Patent by FOM and FOWC.

297.    FIA denies any infringement of the '178 patent.  The allegations in paragraph 297 of the FAFSC are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

## COUNT THREE through COUNT NINE

Excepting the following paragraphs to which the FIA has a specific response, FIA responds as follows to paragraphs 298 through 404:

The Court has dismissed Counts Three, Four, Six, Seven, Eight, and Nine.  No response to those counts is required.  FIA filed a motion to strike assertions of the doctrine of equivalents.  To the extent any allegation in paragraphs 298 through 404 asserts the doctrine of equivalents, no further response to that allegation is required in light of Defendants' pending motion to strike. Further, the remaining allegations in those Counts are related to entities other than FIA. FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.

The allegations in Count Five (paragraphs 322-352) of the FAFSC are also related to entities other than the FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of the allegations in these paragraphs and therefore denies them.

**Paragraphs within paragraphs 322 through 352 of the FAFSC to which FIA provides a specific response:**

68

Paragraph 322.         Mr. Nygaard incorporates by reference each and every allegation in the preceding paragraphs.

322.    FIA incorporates by reference its responses to Mr. Nygaard's allegations in the

preceding paragraphs.

Paragraph 324.         Mr. Nygaard incorporates by reference paragraphs 264-283 of Count One, which explain how the claims apply to the accused F1 cars and the Halo, the patent attached as Exhibit A and the amended illustrative claim charts attached as Exhibit B.

324.    FIA incorporates by reference its responses to paragraphs 264-283.  FIA denies that

the accused formula racing cars and Halo infringe any claims of the '178 Patent.  FIA admits that

the FAFSC attaches a copy of the '178 Patent as Exhibit A and claim charts as Exhibit B.

Paragraph 325.         The inaugural meeting of the F1 Strategy Group was in October 2013.  Prior to the meeting, RBR and all other members of the F1 Strategy Group received a memorandum from Mr. Andy Mellor of the FIA Institute on the development of additional frontal protection for drivers.  Mr. Mellor's memorandum discussed the "Nygaard Patent" at length, and described how it applied to devices being considered for additional head protection exploiting binocular vision.  This memorandum followed a series of meetings in November and December 2012, and also March and April 2013, between Mr. Mellor, others at FIA Institute, FIA, McLaren, Dallara and Mr. Nygaard regarding Mr. Nygaard's patented technology.  In addition, prior to the October 2013 meeting, there was correspondence in May and June 2013, between Mr. Nygaard and FIA Institute's chief administrative officer, Quentin Crombie, about licensing the '178 patent. The October 2013 memorandum from Mr. Mellor did not provide the title or number of the U.S. Patent or its claims or limitations, but did discuss at length the applicability of the "Nygaard Patent" to devices being tested and considered by FIA for additional frontal protection exploiting BVT technology for driver safety.  It would have been a very simple matter to locate the patent online or to simply ask FIA or FIA Institute or Mr. Mellor for the patent or its number.  Mr. Christian Horner was then and is now a director of both RBT and RBR, and was then and is now the CEO of RBT as well as the principal (CEO) of RBR.  Mr. Horner represented RBR at the F1 Strategy Group meeting in October 2013 (and, in fact, gave a presentation at the meeting).  Mr. Horner and the other members of the F1 Strategy Group voted on the development of additional frontal protection for drivers at that inaugural meeting.  RBR and RBT have produced a copy of Mr. Mellor's October 2013 memorandum.   The discussion of the patent in Mr. Mellor's memorandum was either notice for the purpose of 271(b) and 271(f) infringement, or, alternatively, the failure to review the patent was willful blindness.  Accordingly, RBT and RBR had notice of the '178 patent no later than October 2013.  [Footnote 17 The memorandum also followed PowerPoint documents distributed to others interested in additional frontal protection and binocular vision by Mr. Mellor in at least May and September 2013.  These PowerPoint documents were produced by Red Bull in this lawsuit, and included "AlphaPillars" graphics from Mr. Nygaard.]

325.     FIA admits that there was a meeting of the F1 Strategy Group in October 2013. FIA admits there was correspondence in May e 2013 between Mr. Nygaard and Mr. Crombie, but denies that it was about licensing the '178 patent.  FIA admits that Mr. Mellor drafted a memo that discussed a Nygaard patent in connection with the Lotus Roll Hoop, which was being proposed as an AFP device at the October 2013 Strategy Group meeting, and that the memo was included in the materials provided for the meeting. FIA admits that October 2013 follows the other dates included in paragraph 325.  The phrase "followed a series of meetings" is vague and ambiguous. FIA therefore denies the allegations on that basis.  FIA further denies that the meetings with Nygaard concerned "his patented technology."   Many of the allegations in paragraph 144 of the FAFSC are related to entities other than FIA.  FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations and therefore denies them.  To the extent the remaining allegations in paragraph 325 (including footnote 17) relate to entities other than FIA, FIA lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations, and therefore denies the allegations.  To the extent any allegation is not expressly admitted, the allegation is denied.

Paragraph 327.          RBR was part of the F1 Strategy Group that discussed the Halo in 2016 and 2017 and voted in unanimity with other member of the F1 Strategy Group to adopt the Halo starting with the 2018 Grand Prix season.  RBR also participated in drafting specifications for the installation of the Halo, later promulgated as rules by the FIA. In addition, RBT worked on development of the Aeroscreen as part of the Project and proposed it as a solution to the F1 Strategy Group and FIA.

327.     FIA admits that RBR has been a member of the F1 Strategy Group, including in 2016 and 2017.  FIA admits that the F1 Strategy Group discussed the Halo in 2016 and 2017.  FIA admits that the vote to adopt the Halo was unanimous.  FIA admits that the F1 Strategy Group discussed the Aeroscreen as an option for frontal protection.  The remaining allegations in paragraph 327 relate to entities other than FIA.  FIA lacks knowledge or information sufficient to

form a belief as to the truth of the substance of those allegations, and therefore denies the allegations. To the extent any remaining allegation relates to FIA, they are denied. To the extent any allegation is not expressly admitted, the allegation is denied.

Paragraph 331.   Further, FOM received in fall of 2018 a royalty demand from Mr. Nygaard on the '178 patent. FIA received licensing demands from Mr. Nygaard in 2019.

331.   FIA admits it received a licensing demand from Mr. Nygaard in 2019. The remaining allegations in paragraph 331 relate to entities other than FIA. FIA therefore lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations, and therefore denies the allegations. To the extent any allegation is not expressly admitted, the allegation is denied.

Paragraph 340.   The Aeroscreen infringes claims 1 and 2 of the '178 patent literally or by doctrine of equivalents as set forth below. Vehicles implementing the Aeroscreen infringe claims 1, 2, and 4 of the '178 patent. The patent is attached as Exhibit A and claim charts illustrating infringement are attached as Exhibit B and incorporated herein by reference. Claim 1:

A **strengthening member** [the Halo portion of the Aeroscreen] for use in a road vehicle [IndyCars], **for fixing to a structure of the vehicle, and for extending in front of the driver's position** [the vertical member (central pillar) of the Halo portion of the Aeroscreen is fixed to the car at a point in front of the cockpit within the claim construction literally or by equivalents], **the strengthening member being dimensioned so that, when in use, the strengthening member will not prevent the driver from seeing an object which is at least 2 m from the front windscreen,** [the Aeroscreen has a front windscreen][the driver can see objects, e.g., other cars, at this distance when the Aeroscreen is implemented on the vehicle] **when the driver uses binocular vision** [the driver uses binocular vision, e.g., drivers reported no vision issues with the Aeroscreen], and **without requiring the driver to move the driver's head** [the driver does not need to move his or her head to see objects when driving, e.g., other cars in front while driving], wherein the strengthening member has the form of a triangular prism which has been sheared in a vertical plane or **the form of a truncated sheared triangular pyramid.** [the Aeroscreen has the form of a truncated sheared triangular pyramid as formed by its angled vertical member in conjunction with the other angled portion or its equivalent].

340.   FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC. To the extent any allegation in paragraph 340 asserts the doctrine of equivalents, no further response to that allegation is required. FIA admits that the FAFSC attaches a purported copy of

the '178 Patent as Exhibit A and claim charts as Exhibit B.  The remaining allegations in paragraph 340 relate to entities other than FIA.  FIA therefore lacks knowledge or information sufficient to form a belief as to the truth of the substance of those allegations, and therefore denies the allegations.  To the extent any allegation relates to FIA, they are denied.

## COUNT TEN

### Declaratory Judgment Against FIA, FOM, FOWC, RBR and RBT

Paragraph 405.        All preceding paragraphs are incorporated by reference here, including Exhibits A, B and C.

405.    FIA incorporates all previous responses here.

Paragraph 406.        In or around July 15, 2021, FOM, FOWC and FIA unveiled a model of a Formula 1 Grand Prix car built according to new rules for 2022.

406.    Admitted.

Paragraph 407.        This car has significant design changes to reduce airflow off Formula 1 racing cars to permit for closer racing, more overtaking, and more aggressive driving in races.

407.    FIA admits that formula racing car for the 2022 FIA Formula One World Championship has design changes intended to permit closer racing and more overtakes.  To the extent any remaining allegations in paragraph 407 of the FAFSC are not expressly admitted, they are denied.

Paragraph 408.        The racing changes resulting from the new regulations would be more dangerous to drivers, had not the Halo largely, and to date entirely, eliminated injuries to drivers' heads and necks.

408.    FIA admits that the Halo is intended to improve driver safety and that the Halo is one of many safety mechanisms on formula racing cars used in the FIA Formula One World Championship.  To the extent any remaining allegations in paragraph 408 of the FAFSC are not expressly admitted, they are denied.

Paragraph 409.        The 2022 calendar has races in the U.S. both at COTA and a new course in the Miami area. These races will employ the new 2022 regulations.

409.    FIA admits that the 2022 FIA Formula One World Championship season has a race scheduled to occur at COTA in Austin, Texas, and a race in Miami, Florida.  FIA admits that the FIA's 2022 regulations are intended to apply to these races.   To the extent any remaining allegations in paragraph 409 of the FAFSC are not expressly admitted, they are denied.

Paragraph 410.        There have been no material changes regarding the placement or construction of the Halo for new 2022 regulations.

410.    Admitted.

Paragraph 411.        For the reasons given in Count One, paragraphs 264 to 283, the new Formula 1 cars if built as advertised will infringe claims 1, 2, and 4 of the '178 patent, literally or by equivalents.

411.    FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC. To the extent any allegation in paragraph 411 asserts the doctrine of equivalents, no further response to that allegation is required.  FIA denies the remaining allegations in paragraph 411.

Paragraph 412.        For the reasons stated in Count One against FIA and Count Two against FOM and FOWC, regarding the Halo in 2022, these defendants will induce and contribute to direct infringement of all teams and drivers, literally or by equivalents, in Formula One Grand Prix Racing upon entry into the U.S., in making and using the cars for racing. An illustrative claim chart based on the model presented by FOM, FOWC and FIA is attached as Exhibit C, and incorporated by reference.

412.    FIA filed a motion to strike assertions of the doctrine of equivalents in the TAC. To the extent any allegation in paragraph 412, or Exhibit C, asserts the doctrine of equivalents, no further response to that allegation is required.  FIA admits Exhibit C purports to be an illustrative claim chart of a model car presented by Formula One and the FIA, but denies the allegations in the claim chart contained in Exhibit C.   FIA denies all remaining allegations of paragraph 412.

Paragraph 413.        RBT and RBR, for the reasons in Count Five paragraphs 322 to 351, will directly infringe the '178 patent by importing, making and using the inventions, and then supplying their components afterward for reassembly abroad to the next race outside of the U.S. in violation of Section 271(f).

413.    The allegations in paragraph 413 relate to entities other than FIA.  FIA therefore

lacks knowledge or information sufficient to form a belief as to the truth of the substance of those

allegations, and therefore deny the allegations.  To the extent any allegation relates to the Formula

One Defendants, they are denied.

Paragraph 414.        Tickets for the Miami race are sold out.

414.    The allegation "sold out" is vague and, thus, FIA denies the allegations in paragraph

414.

Paragraph 415.        There are actual controversies among Plaintiff and these Defendants
because they have publicized these events, put them on the calendar and also sold tickets and/or
hospitality services, so their plans are firm and they are committed to these racing events.

415.    The allegations "these events" and "these Defendants" are vague and, thus, FIA

denies the allegations in paragraph 415.

Paragraph 416.        Accordingly, Nygaard seeks a declaratory judgment pursuant to 28
U.S.C. § 2201 that if Defendants go forward as planned in Miami or COTA, that they will be
infringing claims 1, 2 and 4 of the '178 patent, literally or by equivalents, under at least Sections
271(b), (c)

416.    FIA denies that the doctrine of equivalents is properly asserted in this case and has

filed a motion to strike assertions of the doctrine of equivalents in the TAC.  To the extent any

allegation in paragraph 416 asserts the doctrine of equivalents, no further response to that

allegation is required.  FIA otherwise admits that Plaintiff seeks a declaratory judgment as stated

in paragraph 416, but denies that Plaintiff is entitled to such a judgment.

Paragraph 417.        Nygaard asks for a declaration of his rights, these Defendants'
infringement, and their responsibility for the acts of all teams and drivers in the races.

417.    FIA admits that Plaintiff seeks the declaration as stated in paragraph 417, but deny

that Plaintiff is entitled to such a declaration.

Paragraph 418.        Nygaard asks for further necessary or proper relief based on a
declaratory judgment or decree may be granted, after reasonable notice and hearing, against any

adverse party whose rights have been determined by such judgment, including but not limited to, attorneys' fees and costs.

418.   FIA admits that Plaintiff seeks relief as stated in paragraph 418, but denies that

Plaintiff is entitled to such relief.

## IX.   <u>PRAYER FOR RELIEF</u>

<u>Paragraph 419.</u>       In consideration of the foregoing, Nygaard respectfully requests that this Court enter an Order granting the following relief:

a)   Enter judgment in favor of Plaintiff Jens H. S. Nygaard, that Defendants Fédération Internationale de l'Automobile, Formula One Management Ltd., Formula One World Championship Ltd., [Mercedes-Benz Grand Prix Ltd., Daimler AG, Ferrari S.p.A.,] [footnote 20 – The Defendants in brackets have been dismissed from this lawsuit without prejudice as previously stated, so there is not currently a claim for relief against them.] Red Bull Technology Ltd., Red Bull Racing, Ltd. and [Dallara Automobili S.p.A.,] have each infringed and each continue to infringe U.S. Patent No. 7,494,178, and finding that such infringement is willful as plead above, making this case exceptional as to each of them;

b)   [Judgment that Lewis Hamilton and Charles Leclerc have each directly infringed the '178 patent];

c)   Enjoin future making, offering for sale, selling, using or importing the Halo and Aeroscreen devices and those not colorably different from them in the U.S. unless they obtain a license;

d)   Award Plaintiff Jens H. S. Nygaard all monetary relief available under the patent laws of the United States, including but not limited to, actual and/or compensatory damages, reasonable royalties, pre-judgment and post-judgment interest, enhanced damages, attorneys' fees and costs pursuant to 35 U.S.C. §§ 284, 285;

e)   Declare this case exceptional and award Plaintiff Jens H. S. Nygaard his reasonable attorney fees pursuant to 35 U.S.C. § 285; and

f)   Grant Plaintiff Jens H. S. Nygaard such additional, other, or further relief as the Court deems just and proper.

419.   FIA admits that the Defendants in brackets have been dismissed from this lawsuit

without prejudice.  FIA denies that Plaintiff is entitled to any of the requested judgments and relief

sought against FIA in paragraph 419, including sub-paragraphs (a)-(f), of the FAFSC.  The

remaining allegations relate to entities other than FIA.  FIA therefore lacks knowledge or

information sufficient to form a belief as to the truth of the substance of those allegations, and

therefore deny the allegations.

## X.    DEMAND FOR JURY TRIAL

Paragraph 420.        Mr. Nygaard demands trial by jury on all issues so triable.

420.    FIA admits Plaintiff's FAFSC includes a demand for a jury trial on all issues so

triable.

## XI.    AMENDED DEFENSES

Without altering the burdens of proof, FIA alleges and asserts the following defenses in

response to Plaintiff's allegations.

### FIRST DEFENSE
### (Failure to State a Claim)

421.    The Second Amended Complaint fails to state a claim on which relief can be

granted.

### SECOND DEFENSE
### (Noninfringement)

422.    FIA has not infringed and does not infringe, directly or indirectly, either literally or

equivalently, willfully, or in any other manner, and is not liable for infringement of any valid and

enforceable claim of the '178 Patent.

### THIRD DEFENSE
### (Invalidity)

423.    One or more of the claims of the asserted patent are invalid for failure to satisfy the

conditions of patentability set forth in 35 U.S.C. § 1 et seq., including 35 U.S.C. §§ 101, 102, 103,

and/or 112. FIA incorporates by reference the Defendants' Final Invalidity Contentions.

**FOURTH DEFENSE**
**(Prosecution History Estoppel and Disclaimer)**

424.    Based on proceedings before the United States Patent and Trademark Office during the prosecution of the applications that led to the issuance of the asserted patent and/or the application to which the asserted patent claim priority, Plaintiff is precluded or otherwise estopped from asserting that any claim of the asserted patent covers, either literally or under the doctrine of equivalents, any product or method made, performed, used, sold, offered for sale, or imported by FIA.

**FIFTH DEFENSE**
**(Limitation of Damages/Costs)**

425.    Plaintiff's claims and prayer for relief are barred in whole or in part by 35 U.S.C. §§ 286, 287, and/or 288.

**SIXTH DEFENSE**
**(Equitable Defenses)**

426.    Plaintiff's claims against FIA are barred, in whole or in part, under principles of equity including laches, waiver and estoppel.

**SEVENTH DEFENSE**
**(Ensnarement)**

427.    To the extent Plaintiff alleges infringement under the doctrine of equivalents, the ensnarement doctrine bars those allegations. Although Plaintiff has failed to meet its burden of providing a hypothetical claim, Defendants' Final Invalidity Contentions identify prior art that would be ensnared by each of the alleged equivalents. For example, Defendants' Final Invalidity Contentions identify prior art disclosing helmet visors, vehicle noses, and other structures that Nygaard alleges are equivalent to the "front windscreen" recited in claims 1 and 4. FIA incorporates by reference Defendants' Final Invalidity Contentions.

**EIGHTH DEFENSE**
**(Temporary Presence Under 35 U.S.C. § 272)**

428.   Nygaard's patent infringement claims are barred under 35 U.S.C. § 272.  Section

272, titled "Temporary presence in the United States," provides:

> The use of any invention in any vessel, aircraft or vehicle of any country which affords
> similar privileges to vessels, aircrafts or vehicles of the United States, entering the United
> States temporarily or accidentally, shall not constitute infringement of any patent, if the
> invention is used exclusively for the needs of the vessel, aircraft or vehicle and is not
> offered for sale or sold in or used for the manufacture of anything to be sold in or exported
> from the United States.

429.   Each of the above statutory requirements are met in this case. As a non-limiting

example, the accused formula racing cars with a Halo are a vehicle of another country, as almost

all formula racing cars originate from other countries that provide reciprocity to the United States.

Those racing cars enter the United States temporarily: the cars are present for a limited time for

the U.S. Grand Prix race in Austin, Texas, and then the cars leave the country for the next foreign

race. The accused Halo device is used for the structural needs of the vehicle and is not offered for

sale or sold in or used for the manufacture of anything to be sold or exported from the United

States. Accordingly, formula racing cars with a Halo satisfy the requirements of Section 272, and

Nygaard's infringement claims are barred under that statute.

**RESERVATION OF ALL DEFENSES**

235.   FIA alleges that it may have other separate and additional defenses of which it is

not presently aware and hereby reserves the right to raise such defenses by amendment of this

Answer, including to conform to proof at trial. FIA therefore reserves all defenses under the

Federal Rules of Civil Procedure, including Rule 8(c), the Patent Laws of the United States and

any other and additional defenses, at law or in equity, that are now or may become available or

appear during, or as a result of, discovery proceedings in this action.

**ATTORNEYS' FEES**

236.    This action qualifies as an exceptional case, supporting an award of reasonable attorneys' fees, costs, and expenses for Counter-Plaintiffs against Counter-Defendant under 35 U.S.C. § 285.

**DEMAND FOR JURY TRIAL**

237.    FIA requests a trial by jury for all issues in this action so triable.

**PRAYER FOR RELIEF**

238.    FIA requests that this Court enter a judgment in its favor and against Plaintiff as follows:

a)      A judgment in favor of FIA and against Plaintiff fully and finally dismissing with prejudice Plaintiff's Second Amended Complaint, or any other amended or supplemental complaint Plaintiff may file, in its entirety, with Plaintiff taking nothing by way of its claims;

b)      A finding that each of the claims of the '178 Patent is not infringed;

c)      A finding that each of the claims of the '178 Patent is invalid;

d)      A finding that this is an exceptional case under 35 U.S.C. § 285 and an award to FIA of its costs, attorneys' fees, and expenses; and

e)      Any other such relief for FIA as the Court deems just and proper.

Dated: April 6, 2022                            Respectfully submitted,

                                                */s/ Claudia Wilson Frost*
                                                Claudia Wilson Frost
                                                State Bar No. 21671300
                                                Jeffrey L. Johnson
                                                State Bar No. 24029638
                                                Ryan C. Wooten
                                                State Bar No. 24075308
                                                ORRICK, HERRINGTON & SUTCLIFFE LLP

609 Main, 40th Floor
Houston, TX 77002
Telephone: 713.658.6400
Facsimile: 713.658.6401
cfrost@orrick.com
jj@orrick.com
rwooten@orrick.com

Travis Jensen
CA Bar No. 259925
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
1000 Marsh Rd.
Menlo Park, CA 94025
Telephone: 650.614.7400
Facsimile: 650.614.7401
tjensen@orrick.com

**ATTORNEYS FOR DEFENDANT
FÉDÉRATION INTERNATIONALE DE
L'AUTOMOBILE**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing is being served via the Court's CM/ECF system on April

6, 2022 on all counsel of record who consent to electronic service.

*/s/ Jeffrey L. Johnson*
Jeffrey L. Johnson